1

2

3

4

5

6

7

8

9

Michael T. Risher (CA SBN 191627)
mrisher@aclunc.org
Linda Lye (CA SBN 215584)
llye@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm St., 2nd Floor
San Francisco, California 94111
Telephone:   415-621-2493
Facsimile:   415-255-8437

Attorneys for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA

10

11

12

13

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

14

15

16

17

18

19

20

21

22

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA; SAN FRANCISCO BAY GUARDIAN,<br><br>Plaintiffs,<br><br>v.<br><br>DRUG ENFORCEMENT ADMINISTRATION,<br><br>Defendants. | CASE NO.: _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, to enforce the public's right to information about how state governments are acquiring controlled substances for use in executing inmates condemned to die, and whether the federal government is overseeing that process, as it must under the Controlled Substances Act, and if so how.  It is urgent to inform the public about this matter because one state has scheduled an execution for May 25, 2011, and a second state has scheduled an execution for June 14, both intending to use one of the controlled substances at issue.  More may do so in the near future.  Plaintiffs American Civil Liberties Union of Northern California and the *San Francisco Bay Guardian* therefore seek expedited processing of records requested from Defendant Drug Enforcement Administration ("DEA").  The DEA has agreed that Plaintiffs' request is entitled to expedited processing pursuant to 5 U.S.C. §522(a)(6)(E), yet almost four months have passed since Plaintiffs submitted their request and DEA has yet to make an initial determination whether it will comply with the request or even to identify a date by which it will make any such determination.  Plaintiffs are statutorily entitled to the expedited treatment requested and granted.

**PARTIES**

2.      Plaintiff American Civil Liberties Union of Northern California ("ACLU-NC") is an affiliate of the American Civil Liberties Union, a national, non-profit, non-partisan organization with the mission of protecting civil liberties from government incursions, safeguarding basic constitutional rights, and advocating for open government.  The ACLU-NC is established under the laws of the state of California and is headquartered in San Francisco, California.  The ACLU-NC has approximately 50,000 members.  In support of its mission, the ACLU-NC uses its communications department to disseminate to the public information relating to its mission, through its website, newsletters, and other publications.

3.      Plaintiff *San Francisco Bay Guardian* ("*The Bay Guardian*") is a corporation organized in the state of California and headquartered in San Francisco, California.  It is a newspaper of general circulation and has the largest circulation of a newsweekly in Northern California, with an audited weekly distribution of 100,000.  *The Bay Guardian* is locally owned,

1

1    independent, has been published continuously since 1966, and its primary activity is publishing or

2    otherwise disseminating information to the public. *The Bay Guardian* has published extensively

3    on state efforts to acquire sodium thiopental for use in executions, and is prepared to publish

4    appropriate articles concerning this subject based on information sought by the FOIA requests at

5    issue here.   In 2011, The Bay Guardian received the California Newspaper Publishers

6    Association's General Excellence award for a weekly newspaper.

7         4.      Defendant Drug Enforcement Administration is a component of the United States

8    Department of Justice.  The DEA is an agency within the meaning of 5 U.S.C. § 552(f).  The

9    DEA has its headquarters in Virginia, and field offices all over the country, including San

10   Francisco.

11                              **JURISDICTION**

12        5.      This Court has subject matter jurisdiction and personal jurisdiction over the parties

13   pursuant to 5 U.S.C. §§552(a)(4)(B) and 552(a)(6)(C)(i).  This Court also has subject matter

14   jurisdiction over this action pursuant to 28 U.S.C. §1331 and 1346.

15                  **VENUE AND INTRADISTRICT ASSIGNMENT**

16        6.      Venue is proper in this district pursuant to 5 U.S.C. §552(a)(4)(B) and 28 U.S.

17   §§1391(e) and §1402.

18        7.      Pursuant to Local Rule 3-2(c) and (d), assignment to the San Francisco division is

19   proper because a substantial portion of the events giving rise to this action occurred in this district

20   and division and because both Plaintiffs are headquartered in San Francisco.

21                            **FACTUAL ALLEGATIONS**

22                  **Nationwide shortage of sodium thiopental**

23        8.      California uses sodium thiopental as part of a three-drug protocol for executing

24   condemned inmates by lethal injection. *See, e.g.,* 15 Cal. Code Regs. §3349.1.1(q),

25   3349.4.5(g)(5)(A), (B). Twenty-nine other states continue to use the same three-drug protocol and

26   the state of Washington uses sodium thiopental alone to carry out executions.  .

27        9.      Sodium thiopental is a Schedule III controlled substance under the Controlled

28   Substances Act, 21 U.S.C. § 801 et seq. *See*  21 U.S.C. § 812(b)(3).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

10.     In May, 2010, media outlets began reporting that sodium thiopental was unavailable due to production problems with Hospira, the only domestic supplier of the drug approved by the Food and Drug Administration ("FDA").  Soon after this was revealed, media outlets began reporting that the shortage of sodium thiopental was resulting in delays in executions in some states.

### Impact of shortage on executions

11.     As the shortage began to impact executions, attorneys, community members and journalists began asking questions and expressing concern over how state corrections officials would obtain sodium thiopental, whether government officials would violate any state or federal law in their effort to obtain the drug, the efficacy of the drugs in their possession, and what other steps officials might take in order to proceed with executions.

12.     An execution in California scheduled for September 30, 2010, was delayed in part because the state's supply of sodium thiopental expired on October 1, and the state was unable to lawfully acquire a new supply of the controlled substance. The issue generated enormous media coverage in the state and nationally.

### Extraordinary measures by states to acquire sodium thiopental

13.     At the end of September, the state of Arizona suddenly acquired a new supply of sodium thiopental. The state eventually revealed that it had imported the sodium thiopental from the United Kingdom, but did not explain how it had imported the drug despite the fact that federal law prohibits importation of controlled substances from sources that are not registered with the FDA.  *See* 21 U.S.C.A. § 360(i) (registration requirement); 21 U.S.C.A. § 331(p) (unlawful to fail to register); 21 C.F.R. §§ 1312.11(b), (c), 1312.18(c)(4).  The origin and legality of the Arizona drug became the focus of an intense legal battle with extensive local, national and international media coverage.  Although Arizona carried out two executions using the sodium thiopental imported from the United Kingdom, the Arizona Supreme Court later delayed an execution due to questions about the origin and efficacy of the drug.

14.     On October 6, 2010, the California Department of Corrections and Rehabilitation ("CDCR") disclosed that it too had recently obtained 12 grams of sodium thiopental, with an

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    expiration date of 2014, despite the nationwide shortage. The CDCR did not disclose the source

2    of the drug or explain how it came into possession of the scare substance. Because the last supply

3    of sodium thiopental produced by Hospira has an expiration date of 2011, the sodium thiopental

4    in the CDCR's possession could not have been manufactured domestically.

5           15.    On October 7, 2010, Plaintiff ACLU-NC sent a request under the California Public

6    Records Act, Cal. Gov. Code §6250 *et seq.*, for records regarding the CDCR's acquisition of

7    sodium thiopental. After CDCR failed to produce responsive records, Plaintiff filed suit and the

8    superior court ordered production of all records as to which CDCR claimed no exemption from

9    disclosure. On December 8, 2010, CDCR produced approximately 1,000 pages of heavily

10   redacted documents. CDCR also withheld approximately 120 documents.

11          16.    The records produced by CDCR revealed that California corrections officials had

12   gone to great lengths in their search for the drug, including attempting initially to import it from

13   Pakistan and actually exchanging lethal injection drugs with Arizona (California provided

14   pancuronium bromide in exchange for imported sodium thiopental). The records also revealed

15   that Arizona corrections officials informed their California counterparts that they had imported

16   sodium thiopental from the United Kingdom and provided a roadmap for doing so; and that

17   California corrections officials then followed Arizona's lead and undertook the process of

18   importing the drug from the United Kingdom.

19          17.    Separate from the record production, CDCR revealed to selected journalists in

20   December 2010 that it had ordered 521 grams of sodium thiopental manufactured by a company

21   in the United Kingdom, it had paid more than $36,000 to acquire the drug, and the controlled

22   substance had arrived in the United States and was awaiting "inspection" by the FDA.

23          18.    Plaintiff ACLU-NC posted the records produced by CDCR to its website promptly

24   upon receipt. Since posting, the page has been visited more than 2,000 times and been viewed

25   more than 3,000 times. From December 8, 2010 to December 13, 2010, it was the most

26   frequently viewed page on the ACLU-NC website. The records are available at:

27   http://www.aclunc.org/issues/criminal_justice/death_penalty/cdcr's_december_8,_2010_response

28   _to_aclu_public_records_act_request.shtml.

4

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

19.     The records disclosed by CDCR raise questions about the conduct of state officials in importing a controlled substance from abroad and exchanging controlled substances with another state, and in particular, whether California corrections officials have complied with the Controlled Substances Act and the Food Drug, and Cosmetics Act. *See, e.g.*, 21 U.S.C. § 829 (unlawful for person other than physician to dispense Schedule III substance without prescription); 21 CFR § 1312.11(b) (requirement of authorization to import); 21 CFR § 207.40(b) ("No drug may be imported or offered for import into the United States unless it is listed as required in subpart C of this part and manufactured, prepared, propagated, compounded, or processed at a registered foreign drug establishment")

20.     The records disclosed by CDCR also generated widespread media coverage in California, nationally, and internationally.

21.     Records revealed by other FOIA requests and state public record act requests across the county have now revealed that six states imported sodium thiopental from a distributor in the United Kingdom, Dream Pharma in 2010. In addition to California and Arizona, Arkansas, Georgia, South Carolina, and Tennessee imported controlled substances from the same United Kingdom distributor.  A private company in the state of Georgia also provided some of the imported sodium thiopental to prison officials in Kentucky.  Two other states, Nebraska and South Dakota, imported a controlled substance purporting to be sodium thiopental from a company in India.

22.     The fact that state officials have been importing sodium thiopental from the United Kingdom and India has generated significant public outcry, legal challenges, and media attention, in the United Kingdom, in the United States, and internationally.  Following disclosure that states in the United States were acquiring execution drugs from sources in the United Kingdom, the government of the United Kingdom imposed new restrictions preventing the export of all controlled substances for purposes of execution.

### Plaintiff's FOIA Requests and Requests for Expedited Processing

23.     While the records produced by CDCR in response to Plaintiff ACLU-NC's Public Records Act request shed much light on the conduct of California officials, wide gaps in the full

5

story remain.  The records revealed that, in the course of their efforts to import the drug from the United Kingdom, California corrections officials communicated with various officials at Defendant DEA.  CDCR, however, redacted portions of the records relating to its communications with DEA and withheld other records on this subject entirely, such as a list of importers approved by the DEA.  Whether those records and redactions are exempt from disclosure under the California Public Records Act is now pending before the California Court of Appeal in *American Civil Liberties Union of Northern California v. Superior Court (CDCR)*, A131111 (First District Court of Appeal).

24.     On January 4, 2011, Plaintiffs ACLU-NC and *The Bay Guardian* submitted a requests to Defendant DEA under FOIA for records created since January 1, 2010 of internal DEA communications and external communications with state officials (including states other than California), other federal agencies, private individuals, or persons outside the United States, relating to the importation from another country, transfer between states, and purchase of sodium thiopental, pancuronium brome, and/or potassium chloride for the purpose of execution. Plaintiffs also sought records of any actual importation, transfer between states, or purchase of sodium thiopental, pancuronium bromide and/or potassium chloride for the purpose of execution. Finally, Plaintiffs sought a list of approved importers of sodium thiopental provided by DEA to CDCR.

25.     Plaintiffs' January 4, 2011 requests also sought expedited processing on the ground that Plaintiffs ACLU-NC and *The Bay Guardian* are "primarily engaged in disseminating information" and there is an "urgency to inform the public concerning bout an actual or alleged federal government activity." 5 U.S.C. §552(a)(6)(E)(v)(II); 32 C.F.R. §1700.12(c)(2) & 28 C.F.R. §16.5(d)(1)(ii).  Plaintiffs' request for expedited processing was further based on the fact that the FOIA requests involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. §16.5(d)(1)(iv).  Plaintiffs attached 139 media articles about efforts by states to acquire controlled substances for purposes of execution to demonstrate the widespread and exceptional medial interest in the subject of their FOIA request.

6

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

26. A copy of Plaintiffs' January 4, 2011 FOIA requests, without attachments, is attached to this Complaint as Exhibit A.

27. By letter dated January 12, 2011, DEA acknowledged receipt of Plaintiffs' requests.

28. By letter dated January 18, 2011, DEA granted Plaintiffs' request for expedited processing.

29. On February 25, 2011, ACLU-NC Program Associate Ana Zamora spoke to Rita Cuellar, a FOIA specialist at DEA who explained that she was handling Plaintiffs' requests and was waiting to hear back as to when documents would be delivered to Plaintiffs.

30. By letter dated March 9, 2011, DEA "apologize[d] for the delay in the processing of [Plaintiffs'] request" and informed Plaintiffs that they would be "notified of [DEA's] initial determination by correspondence at a later date." The letter did not identify a date by which DEA would make an initial determination.

31. On April 7, 2011, ACLU-NC Program Associate Zamora left a voicemail for DEA FOIA specialist Cuellar inquiring as to the status of Plaintiffs' requests. As of the filing of this Complaint, ACLU-NC has not received a response to that voicemail.

32. More than 20 working days have passed since DEA received Plaintiffs' FOIA request.

33. Notwithstanding DEA's purported decision to expedite the processing of Plaintiffs' January 4, 2011 FOIA requests, to date, the agency has not completed the processing of the requests, made an initial determination whether to comply with the requests, or even informed Plaintiffs of a date by which it will make an initial determination or complete the requests.

34. Plaintiffs have exhausted all applicable administrative remedies.

35. DEA has wrongfully withheld the requested records from Plaintiffs.

### **On-going Urgency**

36. Since Plaintiffs submitted their FOIA requests to the DEA, the DEA has seized imported sodium thiopental intended to be used in executions from four states: Georgia, Kentucky, Tennessee and, most recently, South Carolina. The DEA has stated publicly that the

7

drugs were seized as part of an ongoing investigation. Only California, Arizona and Arkansas continue to maintain possession of imported sodium thiopental that originated from the United Kingdom distributor Dream Pharma.

37.     On April 20, Plaintiffs learned through media accounts that the state of Arizona has set an execution date for May 25, apparently intending to use the imported sodium thiopental.

38.     On April 22, Plaintiffs learned through media accounts that the state of Nebraska has set an execution date of June 14. Nebraska possesses and apparently intends to use an imported controlled substance purporting to be sodium thiopental, that was acquired from an Indian company, Kayem Pharmaceutical Pvt. Ltd. Questions have been raised as to whether the substance is in fact sodium thiopental. In addition, the owner of Kaymen Pharmaceutical has publicly stated that his company is not licensed by the DEA to import controlled substances into the United States.

## FIRST CLAIM FOR RELIEF

### Violation of Freedom of Information Act For Wrongful Withholding Of Agency Records

39.     Plaintiffs incorporate paragraphs 1 through 38 above as if fully set forth herein.

40.     Defendant DEA has wrongfully withheld agency records requested by Plaintiffs under FOIA and has failed to comply with the statutory time for the processing of FOIA requests.

41.     Plaintiffs have exhausted the applicable administrative remedies with respect to DEA's wrongful withholding of the requested records.

42.     Plaintiffs are entitled to injunctive relief with respect to the release and disclosure of the requested documents because Defendant DEA continues to improperly withhold agency records in violation of FOIA. The Plaintiffs will suffer irreparable injury from, and have no adequate legal remedy for, the DEA's illegal withholding of government documents pertaining to the subject of Plaintiffs' FOIA request.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court:

A.  Order Defendant DEA to process immediately the requested records in their entirety;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

B. Order Defendant DEA to make the requested records in their entirety available to Plaintiffs promptly upon completion of its processing of such records;

C. Provide for expeditious proceedings in this action;

D. Enter a preliminary and permanent injunction against the DEA ordering the relief requested herein;

E. Declare that DEA's failure to disclose the records requested by Plaintiffs is unlawful;

F. Award Plaintiffs' their litigation costs and reasonable attorney's fees incurred in this action;

G. Grant such other relief as the Court may deem just and proper.

Dated:  April 22, 2011

By: _____

Linda Lye

Michael T. Risher
Linda Lye
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437

Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# Exhibit A





January 4, 2011

**Via Certified Mail, Return Receipt Requested**

Freedom of Information Operations Unit (SARO)
Drug Enforcement Administration
700 Army Navy Drive
Arlington, VA 22202

Director of Public Affairs
Office of Public Affairs
U.S. Department of Justice, Room 1128
950 Pennsylvania Avenue, NW,
Washington DC 20530-0001

> **Re:   Request Under Freedom of Information Act—Expedited Processing**

Dear Freedom of Information Officer:

The American Civil Liberties Union of Northern California (ACLU-NC) and the *San Francisco Bay Guardian* (*Guardian*) submit this expedited Freedom of Information Act (FOIA) request for records in the possession of the Drug Enforcement Agency (DEA) pertaining to the acquisition of controlled substances by state officials in California, Arizona, and other states for the purpose of carrying out executions of condemned prisoners by lethal injection. The ACLU-NC and the *Guardian* submit this request pursuant to the FOIA, 5 U.S.C. § 552, implementing regulations 28 C.F.R. § 16.1 et. seq., and any other applicable regulations.

Records recently revealed by the California Department of Corrections (CDCR) indicate that the states of California, Arizona and Arkansas have imported controlled substances to be used in executions. These records reveal that the CDCR was in direct communication with the DEA during 2010 regarding the importation of controlled substances, the procurement of controlled substances generally, and the requirements for transferring controlled substances between state corrections departments. The records disclosed by state officials raise serious questions about whether all applicable state and federal laws have been followed in the acquisition of controlled substances for the purpose of execution. The issue has generated widespread and exceptional media coverage, with 139 stories published in the last six months. The public has a compelling

NANCY PEMBERTON, *CHAIRPERSON* | SUSAN MIZNER, JAHAN SAGAFI, FARAH BRELVI, ALLEN ASCH, *VICE CHAIRPERSONS* | DICK GROSBOLL, *SECRETARY/TREASURER*
ABDI SOLTANI, *EXECUTIVE DIRECTOR* | KELLI EVANS, *ASSOCIATE DIRECTOR* | CHERI BRYANT, *DEVELOPMENT DIRECTOR* | SHAYNA GELENDER, *ORGANIZING & COMMUNITY ENGAGEMENT DIRECTOR*
LAURA SAPONARA, *COMMUNICATIONS DIRECTOR* | ALAN SCHLOSSER, *LEGAL DIRECTOR* | ALLEN HOPPER, NATASHA MINSKER, NICOLE A. OZER, DIANA TATE VERMEIRE, *POLICY DIRECTORS*
FRANCISCO LOBACO, *LEGISLATIVE DIRECTOR* | VALERIE SMALL NAVARRO, *SENIOR LEGISLATIVE ADVOCATE* | TIFFANY MOK, *LEGISLATIVE ADVOCATE* | STEPHEN V. BOMSE, *GENERAL COUNSEL*

AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA
39 DRUMM STREET, SAN FRANCISCO, CA 94111 | T/415.621.2493 | F/415.255.1478 | TTY/415.863.7832 | WWW.ACLUNC.ORG

Drug Enforcement Administration
January 4, 2011
Page 2

need for more information as these issues pertain to the integrity of state and federal government and affect public confidence in government.

## I.    **Requested Records**

We seek disclosure of agency records[1] in your[2] possession that fall within the following categories:

1. Records created since January 1, 2010, of communications between any person at the DEA and any state official, employee or agent regarding the importation from another country of sodium thiopental, pancuronium bromide, and/or potassium chloride for the purpose of execution.

2. Records created since January 1, 2010, of communications between any person at the DEA and any state official, employee or agent regarding the transfer between states of sodium thiopental, pancuronium bromide, and/or potassium chloride for the purpose of execution.

3. Records created since January 1, 2010, of communications between any person at the DEA and any state official, employee or agent regarding the purchase of sodium thiopental, pancuronium bromide, and/or potassium chloride for the purpose of execution.

4. Records created since January 1, 2010, of internal communications within the DEA regarding the importation, transfer or purchase of sodium thiopental, pancuronium bromide, and/or potassium chloride by state officials for the purpose of execution.

5. Records created since January 1, 2010, of communications between any person at the DEA and any person outside the United States, including any official, employee or agent of any foreign government, regarding the importation from another country of sodium thiopental, pancuronium bromide, and/or potassium chloride for the purpose of execution.

6. Records created since January 1, 2010, of communications between any person at the DEA and any private individual regarding the importation, transfer or purchase of sodium thiopental, pancuronium bromide, and/or potassium chloride by state officials for the purpose of execution.

7. Records created since January 1, 2010, of communications between any person at the DEA and any employee, agent or official of the U.S. Food and Drug Administration

---

[1] The term "records" as used herein includes all records or communications preserved in written or electronic form, including but not limited to: correspondence, documents, data, videotapes, audio tapes, emails, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, training materials, other manuals, or studies.
[2] Requestors seek records in the possession or control of the DEA office in Washington, D.C. and any field offices.

Drug Enforcement Administration
January 4, 2011
Page 3

    regarding the importation, transfer or purchase of sodium thiopental, pancuronium
bromide, and/or potassium chloride by state officials for the purpose of execution.

8.   Records created since January 1, 2010, of communications between any person at the
DEA and any employee, agent or official of U.S. Customs and Border Protection
regarding the importation, transfer or purchase of sodium thiopental, pancuronium
bromide, and/or potassium chloride by state officials for the purpose of execution.

9.   Records created since January 1, 2010, regarding any actual importation of sodium
thiopental, pancuronium bromide, and/or potassium chloride by state officials for the
purpose of execution, including but not limited to: declarations under 21 CFR
§ 1312.18b; DEA form 236; any other forms; attachments to any forms or declarations;
tracking records; and requests for exemption, expedited processing or other special
treatment.

10. Records created since January 1, 2010, regarding any actual transfer of sodium
thiopental, pancuronium bromide, and/or potassium chloride between state officials for
the purpose of execution, including but not limited to: declarations; forms; attachments to
any forms or declarations; tracking records; and requests for exemption, expedited
processing or other special treatment.

11. Records created since January 1, 2010, regarding any actual purchase of sodium
thiopental, pancuronium bromide, and/or potassium chloride by state officials for the
purpose of execution, including but not limited to: declarations; forms; attachments to
any forms or declarations; tracking records; and requests for exemption, expedited
processing or other special treatment.

12. The list of approved importers of thiopental, provided by the DEA to the CDCR.

## II.    Request for Expedited Processing

Title 5 U.S.C. § 552(a)(6)(E) provides for expedited processing of requests for information in
cases in which the person requesting the records demonstrates a compelling need. By statute, for
requests made by persons primarily engaged in disseminating information, urgency to inform the
public concerning actual or alleged federal government activity constitutes a "compelling need."
5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. 16.5(d)(1)(ii). In addition, Department of Justice
regulations state that FOIA requests are entitled to expedited processing when the information
requested involves "[a] matter of widespread and exceptional media interest in which there exist
possible questions about the government's integrity which affect public confidence." 28 C.F.R. §
16.5(d)(1)(iv). Here, the requestors of this information are primarily engaged in disseminating
information and, for reasons made clear below, there is urgency to inform the public concerning
how state officials have acquired and are currently acquiring controlled substances to use in
executions, and the role of federal officials in this process.[3] The acquisition of controlled

---

[3] In 2006, a federal court ordered the Department of Defense to comply with a request for expedited processing
request by the ACLU-NC and the *Guardian*. *ACLU-NC, et. al. v. Dept. of Defense*, 2006 WL 1469418, Case No. 06-

Drug Enforcement Administration
January 4, 2011
Page 4

substances for use in execution has been widely reported, caused widespread anxiety, and raised widespread concerns about potential misconduct by state and federal government officials.

> 1.   Requestors.

The American Civil Liberties Union of Northern California (including the ACLU Foundation of Northern California), is an affiliate of the ACLU, a national organization that works to protect the civil liberties of all people, including the safeguarding of the basic constitutional rights to privacy, free expression, and due process of law. The ACLU-NC is responsible for serving the population of northern California. The communications department of the ACLU-NC is the division of the ACLU-NC that is responsible for disseminating information to the public about issues of concern to the ACLU-NC and to the general public.

The *San Francisco Bay Guardian* is the largest circulation newsweekly in northern California, with an audited weekly distribution of 100,000. The paper is locally owned, independent, and has been published continuously since 1966.

> 2.   Widespread Media Interest and Concerns Regarding Government Activities.

Since May 2010, there has been extensive news coverage around the country about how state officials are acquiring the controlled substances used in executions. More than 139 separate stories have been published, appearing in hundreds of media outlets in the United States and internationally. The issue has been covered by the largest media outlets, including the Associated Press, New York Times, Wall Street Journal, USA Today, Christian Science Monitor, CNN, MSNBC, and NPR. This widespread media attention demonstrates the public interest and concern over the potential for improper government activity in the acquisition of these controlled substances which are lethal and dangerous drugs.[4]

In May, 2010, media outlets began reporting that one of the controlled substances commonly used in executions in the United States, sodium thiopental, was unavailable due to production problem with the only FDA-approved, domestic supplier of the drug, Hospira. Soon after this was revealed, media outlets began reporting that the shortage of sodium thiopental was resulting in delays in executions in some states.

> *See* Andrew Welsh-Huggins, "Worldwide shortage of death penalty drug threatened upcoming Ohio execution," Associated Press, May 11, 2010 (Appendix A, Tab 1); Michael Kiefer, "Drug shortage may imperil executions in Arizona," Arizona Republic, May 17, 2010 (Appendix A, Tab 2); Jessie Hallady, "Anesthesia shortage may delay executions," USA Today, August 28, 2010 (Appendix A, Tab 3); Lucile Malandain, "Lethal drug supply dries up, postponing US executions," Agence France-Presse, September 4, 2010 (Appendix A, Tab 4); Julie Kent, "US States to Postpone Executions as Lethal Drug Runs Out," Cleveland Ledger, September 5, 2010 (Appendix A, Tab 5);

---

01698 (N.D. Cal. May 25, 2006). *See also American Civil Liberties Union v. Dept. of Defense*, 339 F.Supp. 2d 501 (S.D.N.Y. 2004) (setting schedule for disclosure of documents to ACLU under expedited processing request).
[4] The news articles mentioned in this letter are attached hereto as Appendix A.

Drug Enforcement Administration
January 4, 2011
Page 5

Kathy Lohr, "States Delay Executions Owing To Drug Shortage," NPR All Things Considered, September 16, 2010 (Appendix A, Tab 6); Andrew Welsh-Huggins, "Some US executions held up by shortage of drug," Associated Press, September 28, 2010 (Appendix A, Tab 7); Mike Ward, "Drug shortage threatens executions, but not in Texas," Austin American Statesman, September 28, 2010 (Appendix A, Tab 8); Mike Tolson, "Drug shortage delays some executions, but not in Texas," Houston Chronicle, September 28, 2010 (Appendix A, Tab 9); Kevin Sack, "Shortage of Widely Used Anesthetics Is Delaying Executions in Some States," New York Times, September 29, 2010 (Appendix A, Tab 10); "Drugs shortage halts US executions," UK Associated Press, September 29, 2010 (Appendix A, Tab 11).

As the shortage began to impact executions, attorneys, community members and journalists began asking questions and expressing concern over how state corrections officials would obtain sodium thiopental, whether government officials would violate any state or federal law in their effort to obtain the drug, the efficacy of the drugs in their possession, and what other steps officials might take in order to proceed with executions.

*See* Michael Baker, "Federal judge issues stay of execution for Oklahoma death row inmate," Oklahoman, August 18, 2010 (Appendix A, Tab 12); Al Tompkins, "States Deal with Impact of Death Penalty Drug Shortage," Poynter, August 26, 2010 (Appendix A, Tab 13); Claudia Coffey, "Ky. governor holding off on some executions due to shortage of key drug," WHAS11.com, August 26, 2010 (Appendix A, Tab 14); Michael Baker, "Shortage of death penalty drug in Oklahoma delays executions," Oklahoman, September 13, 2010 (Appendix A, Tab 15); Lucile Malandain, "Drug shortage throws US executions into disarray," Agence France-Presse, October 25, 2010 (Appendix A, Tab 16); "Arkansas supplied drug used in recent Oklahoma execution," Associated Press, November 8, 2010 (Appendix A, Tab 17); Rina Palta, "Inside the evolving market for lethal injection drugs," KALW Informant, November 9, 2010 (Appendix A, Tab 18); Nathan Koppel, "New Execution Drug Approved," Wall Street Journal, November 19, 2010 (Appendix A, Tab 19); Koppel, "The Sun Shines In Texas on Lethal Injection," Wall Street Journal, November 19, 2010 (Appendix A, Tab 20); Kathy Lohr, "Okla. considers using vet drug to execute inmate," NPR Morning Edition, November 19, 2010 (Appendix A, Tab 21); Mike Ward, "Texas has lethal drugs on hand to execute 39 condemned criminals," Austin American Statesman, November 19, 2010 (Appendix A, Tab 22); Kevin Horrigan, "Capital punishment: How will Missouri "lethally inject" if it runs out of a lethal drug?" St. Louis Today, November 21, 2010 (Appendix A, Tab 23); Sam Stanton and Denny Walsh, "Drug shortage stirs death penalty debate in the U.S. and beyond," Sacramento Bee, December 5, 2010 (Appendix A, Tab 24); "Oklahoma executes man using new drug combination," Associated Press, December 16, 2010 (Appendix A, Tab 25).

An execution in California scheduled for September 30, 2010, was delayed in part because the state's supply of sodium thiopental expired on October 1, and the state was unable to lawfully acquire a new supply of the controlled substance. The issue generated enormous media coverage in the state and nationally.

Drug Enforcement Administration
January 4, 2011
Page 6

*See* Jesse McKinley and Malia Wollan, "Governor Postpones Execution in California,"
New York Times, September 27, 2010 (Appendix A, Tab 26); Michael Winter, "Drug
shortage prompts Calif. to suspend executions after Sept. 30," USA Today, September
27, 2010 (Appendix A, Tab 27); Howard Mintz, "Execution drama unfolds in
California," San Jose Mercury News, September 27, 2010 (Appendix A, Tab 28); Jesse
McKinley and Malia Wollan, "Judges Cancels California Execution," New York Times,
September 28, 2010 (Appendix A, Tab 29); CNN Wire Staff, "Court ruling may stall
California execution," CNN, September 28, 2010 (Appendix A, Tab 30); Paul Elias,
"Court orders hearing for condemned Calif. Inmate," Associated Press, September 28,
2010 (Appendix A, Tab 31); Carol Williams, "California's first execution in five years
delayed by legal issues," Los Angeles Times, September 28, 2010 (Appendix A, Tab
32); Sam Stanton, "Death penalty reprieve ordered," Sacramento Bee, September 28,
2010 (Appendix A, Tab 33); Bob Egelko, "Court sends execution case back to U.S.
judge," San Francisco Chronicle, September 28, 2010 (Appendix A, Tab 34); Julia
Cheever, "Appeals Court Orders Federal Judge To Reconsider Stay Of Execution
Request For San Quentin Inmate," Bay City News, September 28, 2010 (Appendix A,
Tab 35); Paul Elias, "Fed judge blocks Calif. execution set for Thursday," Associated
Press, September 29, 2010 (Appendix A, Tab 36); Paul Elias, "Calif execution try
collapses after court setbacks," Associated Press, September 29, 2010 (Appendix A, Tab
37); Howard Mintz, "With time running out, judge blocks execution," San Jose Mercury
News, September 29, 2010 (Appendix A, Tab 38); Kevin Fagan, "Execution: Expiration
date near for death drug," San Francisco Chronicle, September 29, 2010 (Appendix A,
Tab 39); Denny Walsh, "Federal judge halts scheduled Thursday execution," Sacramento
Bee, September 29, 2010 (Appendix A, Tab 40); Carol Williams, "Judge halts execution
of rapist-murderer," Los Angeles Times, September 29, 2010 (Appendix A, Tab 41);
Vauhini Vara and Nathan Koppel, "Spotlight on Injection Drug as Judge Stays
Execution," Wall Street Journal, September 30, 2010 (Appendix A, Tab 42); Jack
Leonard and Victoria Kim, "California Supreme Court ends legal battle over execution,"
Los Angeles Times, September 30, 2010 (Appendix A, Tab 43); Denny Walsh and Sam
Stanton, "State drops effort to execute rapist-murderer by today," Sacramento Bee,
September 30, 2010 (Appendix A, Tab 44); Howard Mintz, "No Executions in '10," San
Jose Mercury News, September 30, 2010 (Appendix A, Tab 45); Julia Cheever,
"Supreme Court Blocks Execution Of San Quentin Man, Schwarzenegger Decries
Decision," Bay City News, September 30, 2010 (Appendix A, Tab 46).

At the end of September, the state of Arizona suddenly acquired a new supply of sodium
thiopental. The state eventually revealed that it had imported the sodium thiopental from the
United Kingdom, but did not explain how it had imported the drug despite the fact that federal
law prohibits importation of controlled substances from sources that are not approved by the
FDA. The origin and legality of the Arizona drug became the focus of an intense legal battle with
extensive local, national and international media coverage.

*See* "Arizona says it may get drug needed for execution," Associated Press, September
23, 2010 (Appendix A, Tab 47); Michael Kiefer, "Arizona Supreme Court puts
execution on hold," Arizona Republic, September 24, 2010 (Appendix A, Tab 48);
Michael Kiefer, "Arizona death row inmate's lawyers want drug info from state," Arizona

Drug Enforcement Administration
January 4, 2011
Page 7

Republic, October 15, 2010 (Appendix A, Tab 49); James Clark, "Some Call it Murder: Breaking the Law in the Name of Capital Punishment," Change.org, October 15, 2010 (Appendix A, Tab 50); Paul Davenport, "Arizona execution caught in drug supply debate," October 19, 2010 (Appendix A, Tab 51); Michael Kiefer, "Judge asks Arizona for execution-drug source," Arizona Republic, October 21, 2010 (Appendix A, Tab 52); "Ariz. inmate files suit challenging execution drug," Associated Press, October 21, 2010 (Appendix A, Tab 53); John Schwartz, "Use of Drug Challenged in Death Penalty Case," New York Times, October 23, 2010 (Appendix A, Tab 54); Michael Kiefer, "Arizona told to reveal source of drug for execution," Arizona Republic, October 23, 2010 (Appendix A, Tab 55); John Schwartz, "Arizona: Drug Question Holds Up Execution," New York Times, October 25, 2010 (Appendix A, Tab 56); Paul Davenport, "Judge blocks Arizona execution, state appeals," Associated Press, October, 25, 2010 (Appendix A, Tab 57); "Inmate's lawyers ask judge to discuss drug info," Associated Press, October 25, 2010 (Appendix A, Tab 58); "State ordered to reveal info about drug for execution use," Associated Press, October 25, 2010 (Appendix A, Tab 59); "Arizona submits info on execution drugs to judge," Associated Press, October 25, 2010 (Appendix A, Tab 60); "Judge puts off Arizona execution, saying state not forthcoming," CNN, October 25, 2010 (Appendix A, Tab 61); Michael Kiefer, "Judge to question whether Arizona illegally obtained lethal-injection drug," Arizona Republic, October 25, 2010 (Appendix A, Tab 62); "Brewer Denies Delay In Landrigan Execution," KPHO-TV, October 25, 2010 (Appendix A, Tab 63); James Clark, "Sudden Secrecy Surrounds Death Penalty Drugs," Change.org, October 25, 2010 (Appendix A, Tab 64); Michael Kiefer, "Judge delays execution set for today," Arizona Republic, October 26, 2010 (Appendix A, Tab 65); "US execution blocked in row over lethal drug source," Agence France-Presse, October 26, 2010 (Appendix A, Tab 66); George Miller, "Inmate delays execution through drug-source protest," Fierce Pharma Manufacturing, October 26, 2010 (Appendix A, Tab 67); John Schwartz, "Murderer executed in Arizona," New York Times, October 27, 2010 (Appendix A, Tab 68); Nina Totenberg, "Supreme Court OKs Foreign Lethal Injection Drug," NPR, October 27, 2010 (Appendix A, Tab 69); "State Goes Overseas For Lethal Injection Drug," Associated Press, October 27, 2010 (Appendix A, Tab 70); "Arizona convicted killer's last words: 'Boomer Sooner,'" CNN, October 27, 2010 (Appendix A, Tab 71); Michael Kiefer, "Arizona executes inmate after federal judge lifts stay," Arizona Republic, October 27, 2010 (Appendix A, Tab 72); "Arizona executes man after Supreme Court green light," Agence France-Presse, October 27, 2010 (Appendix A, Tab 73); David Savage, "Justice Elena Kagan's first vote is against an execution," Los Angeles Times, October 27, 2010 (Appendix A, Tab 74); Victoria Ward, "Arizona execute man with drug supplied by British company," Telegraph, October 27, 2010 (Appendix A, Tab 75); Chris McGreal, "Arizona execution goes ahead after stay lifted," Guardian, October 27, 2010 (Appendix A, Tab 76); Rina Palta, "What the Arizona execution means for the death penalty nationwide," KALW Informant, October 27, 2010 (Appendix A, Tab 77); Tony Mauro, "High Court Split Paves Way for Arizona Execution," National Law Journal, October 28, 2010 (Appendix A, Tab 78); Joan Biskupic and Kevin Johnson, "Justices not convinced by arguments to delay execution," USA Today, October 28, 2010 (Appendix A, Tab 79); George Miller, "Report: Archimedes anesthetic used in Arizona execution," Fierce Pharma Manufacturing, October 28, 2010 (Appendix A, Tab 80).

Drug Enforcement Administration
January 4, 2011
Page 8

Although Arizona was able to carry out one execution using the controlled substance imported from the United Kingdom, the action was criticized and continues to raise serious legal questions. The Arizona Supreme Court subsequently delayed an execution due to questions about the origin and efficacy of the drug.

> *See* Dahlia Lithwick, "Lethal Deflection," Slate.com, October 28, 2010 (Appendix A, Tab 81); New York Times Editorial, "No Justification," October 29, 2010 (Appendix A, Tab 82); James Clark, "Jeffrey Landrigan Executed by Arizona Amid Continued Secrecy," Change.org, October 30, 2010 (Appendix A, Tab 83); "Lawyer files complaint over British execution drug," Agence France-Presse, November 19, 2010 (Appendix A, Tab 84); Michael Kiefer, "Arizona Supreme Court puts off date for execution," Arizona Republic, December 1, 2010 (Appendix A, Tab 85).

On October 6, 2010, the California Department of Corrections and Rehabilitation disclosed that it too had recently obtained 12 grams of sodium thiopental, with an expiration date of 2014, despite the nationwide shortage. The CDCR did not disclose the source of the drug or explain how it came into possession of the scare substance. Because the last supply of sodium thiopental produced by Hospira has an expiration date of 2011, the sodium thiopental in the CDCR's possession could not have been manufactured domestically.

> *See* Carol Williams, "State has enough sodium thiopental to execute four," Los Angeles Times, November 8, 2010 (Appendix A, Tab 86); "Drug issue stalls executions in California," UPI, November 8, 2010 (Appendix A, Tab 87); Julie Small, "Corrections chief promises to divulge how California secured lethal injection drug," KPCC, November 19, 2010 (Appendix A, Tab 88); James Clark, "State refuses to give up lethal drug dealer," Change.org, November 22, 2010 (Appendix A, Tab 89).

The ACLU-NC filed a request under the California Public Records Act (PRA) to get records regarding the CDCR's acquisition of sodium thiopental. The *Guardian,* the Village Voice and the Associated Press also filed PRA requests seeking the records. Because the CDCR failed to respond to any of these requests, the ACLU-NC subsequently filed suit to enforce the PRA request, resulting in a court order that forced the CDCR to disclose the records.

> *See* Rina Palta, "ACLU: Where did California get its execution drugs?" KALW Informant, November 18, 2010 (Appendix A, Tab 90); Ryan Gabrielson, "ACLU sues state over lethal injection drug," California Watch, November 19, 2010 (Appendix A, Tab 91); Carol Williams, "State ordered to reveal source of its lethal-injection drug," Los Angeles Times, December 2, 2010 (Appendix A, Tab 92); Julie Small, "California prison officials ordered to disclose information on lethal injection drug," KPCC, December 2, 2010 (Appendix A, Tab 93); Rina Palta, "Judge: California must make execution drug records public," KALW Informant, December 2, 2010 (Appendix A, Tab 94).

The day before releasing the records to the ACLU-NC, the CDCR disclosed to selected journalists that it had ordered 521 grams of sodium thiopental manufactured by a company in the United Kingdom and that the state paid more than $36,000 to acquire the drug. The CDCR told

Drug Enforcement Administration
January 4, 2011
Page 9

the journalists that the controlled substance had arrived in the United States but was currently in the procession of the FDA awaiting inspection.

> *See* Paul Elias, "Calif gets supply of drug used during executions," Associated Press, December 6, 2010 (Appendix A, Tab 95); Rina Palta, "Where California got its execution drugs," KALW Informant, December 6, 2010 (Appendix A, Tab 96); Paul Elias, "San Quentin gets supply of drug used during executions," Associated Press, December 7, 2010 (Appendix A, Tab 97); Sam Stanton, "Execution drug came from UK, CA officials say," Sacramento Bee, December 7, 2010 (Appendix A, Tab 98); Carol Williams, "California now has enough drugs to execute 175 death row inmates," Los Angeles Times, December 7, 2010 (Appendix A, Tab 99); "California buys execution drug from Britain," Agence France-Presse, December 7, 2010 (Appendix A, Tab 100); Rula Al-Nasrawi, "Secrets of the state's death-drug deal," San Francisco Bay Guardian, December 7, 2010 (Appendix A, Tab 101); Julie Small, "Prisons release details of lethal injection drug acquisition," KPCC-FM, December 8, 2010 (Appendix A, Tab 102); James Clark, "California reveals its drug dealer," Change.org, December 8, 2010 (Appendix A, Tab 103); "California Bought Scarce Lethal-Injection Drug From British Firm," Crime Report, December 8, 2010 (Appendix A, Tab 104); "CA Waiting For Lethal Injection Drug Approval," Corrections.com, December 8, 2010 (Appendix A, Tab 105).

The CDCR produced 980 pages of records regarding the acquisition of execution drugs to the ACLU-NC on December 8, 2010. The ACLU-NC posted the documents to its website the same day. Since posting, the page has been visited 2,213 times and viewed 2,835 times. From December 8, 2010 to December 13, 2010, it was the most frequently viewed page on the ACLU-NC website. The records are available at:

> http://www.aclunc.org/issues/criminal_justice/death_penalty/cdcr's_december_8,_2010_r esponse_to_aclu_public_records_act_request.shtml.

The records disclosed by the CDCR raise serious questions about the conduct of state and federal government officials, and raise concern that state and federal laws were violated by the states' recent acquisition of sodium thiopental and by exchanges of controlled substances between different states. The information revealed in the records generated widespread media coverage in California, nationally and internationally.

> *See* Julie Small, "California's Corrections Department swapped lethal drugs with Arizona," KPCC, December 8, 2010 (Appendix A, Tab 106); George Miller, "Fierce Pharma Mfg - Imported death penalty drug to be tested by FDA," Fierce Pharma Manufacturing, December 8, 2010 (Appendix A, Tab 107); Paul Elias, "Docs show Calif.'s worldwide execution drug search," Associated Press, December 9, 2010 (Appendix A, Tab 108); Paul Elias, "Calif. scrambled for execution drug," Associated Press, December 9, 2010 (Appendix A, Tab 109); Rina Palta, "Timeline: California's scramble for execution drugs," KALW Informant, December 9, 2010 (Appendix A, Tab 110); Natasha Minsker, "I've got a secret mission for you," ACLU Blog of Rights, December 9, 2010 (Appendix A, Tab 111); Jeff Neumann, "Arizona prison officials

Drug Enforcement Administration
January 4, 2011
Page 10 ·

called 'life savers' for sharing lethal drug," Gawker.com, December 9, 2010 (Appendix A, Tab 112); Mike Ward, "California: Texas officials turned down request for execution drug," Statesman.com, December 9, 2010 (Appendix A, Tab 113); David Usborne, "Emails reveal gallows humour on death row," Independent, December 10, 2010 (Appendix A, Tab 114); Christopher Brauchli, "The executioner's drugs," Counter Punch, December 10, 2010 (Appendix A, Tab 115); Anthony Lydgate, Weekly Review, Harper's Magazine, December 14, 2010 (Appendix A, Tab 116); "Mysteries of the death-drug scramble," *San Francisco Bay Guardian*, December 14, 2010 (Appendix A, Tab 117); Ryan Gabrielson, "State withholds name of lethal drug supplier," California Watch, December 17, 2010 (Appendix A, Tab 118).

*See also* The Colbert Report, Tiny Triumphs—Lethal Drug Shortage, available at: http://www.colbertnation.com/the-colbert-report-videos/368731/december-15-2010/tiny-triumphs---lethal-drug-shortage?xrs=share_copy

In addition, the fact that state officials have been importing sodium thiopental from the United Kingdom has generated significant public outcry, legal challenges, and media attention, both in the United Kingdom, and in the United States. Following disclosure that states in the U.S. were acquiring execution drugs from sources in the UK, the government of the United Kingdom imposed new restrictions preventing the export of sodium thiopental for purposes of execution.

*See* Clive Stafford Smith, "The British company making a business out of killing," Guardian, October 26, 2010 (Appendix A, Tab 119); Owen Bowcott and Chris McGreal, "British firm denies exporting drug for Arizona execution," Guardian, October 27, 2010 (Appendix A, Tab 120); Robert Verkaik, "British company link to drug used in execution," Independent, October 27, 2010 (Appendix A, Tab 121); Michael Seamark, "British company denies exporting drug used in US execution after Arizona's supplies run dry," Daily Mail, October 28, 2010 (Appendix A, Tab 122); Ian Dunt, "Cable under fire for allowing execution drug sale," Politics.com, November 2, 2010 (Appendix A, Tab 123); David Cronin, "Not Executing, Just Enabling, IPS News, November 4, 2010 (Appendix A, Tab 124); Paddy, McGuffin, "Cable in court over death drug export," UK Morning Star, November 17, 2010 (Appendix A, Tab 125); "Cable attacked on 'execution drug.'" UK Press Associated, November 17, 2010 (Appendix A, Tab 126); John Aston, "Bid to ban export of 'execution' drug," Independent, November 17, 2010 (Appendix A, Tab 127); Benjamin Timmins, "British imposes controls on lethal injection drug," Associated Press, November 29, 2010 (Appendix A, Tab 128); Clive Stafford Smith, "A welcome U-turn from Vince Cable on execution drug," Guardian, November 29, 2010 (Appendix A, Tab 129); Michael Kiefer, "Controls imposed on lethal injection drug Arizona uses," Arizona Republic, November 29, 2010 (Appendix A, Tab 130); Dominic Casciani, "US lethal injection drug faces UK export restrictions," BBC, November 29, 2010 (Appendix A, Tab 131); Peter Walker, "Vince Cable restricts export of drug used in US executions," Guardian, November 29, 2010 (Appendix A, Tab 132); Daily Mail Reporter, "Human rights victory as Vince Cable imposes restrictions," November 29, 2010 (Appendix A, Tab 133); Tim Edwards, "Cable restricts export of lethal injection drug to US," First Post, November 29, 2010 (Appendix A, Tab 134); Nathan Koppel and Jeanne Whalen, "U.K. Limits Execution Drug's Export," Wall Street

Drug Enforcement Administration
January 4, 2011
Page 11

> Journal, November 30, 2010 (Appendix A, Tab 135); "U.K. to limit export of execution drug widely used in U.S.," MSNBC, November 30, 2010 (Appendix A, Tab 136); James Clark, "America's death penalty looses and ally," Change.org, November 30, 2010 (Appendix A, Tab 137); Mark Townsend, "US execution drugs supplied secretly by British companies," Guardian, December 19, 2010 (Appendix A, Tab 138); Paddy McGuffin, "Lethal drugs secretly shipped to California," UK Morning Star, December 19, 2010 (Appendix A, Tab 139).

As the forgoing demonstrates, questions about how state officials are acquiring controlled substances to use in executions have generated exceptional, widespread media coverage in the United States and across the globe. The issue raises substantial questions about the integrity of government, at the state and federal level. The public has an urgent need for additional information as state officials are actively seeking to carry out executions using controlled substances of questionable origin and efficacy. For these reasons, the DEA should grant expedited processing of this FOIA request.

## III.   "Public Interest" Fee Waiver Request

We request a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii); 28 C.F.R. § 16.11(k)(1).

The records sought here will significantly contribute to public understanding of the manner in which state officials have acquired the controlled substances used in executions and the role of federal officials in that process. *See* 28 C.F.R. § 16.11(k)(1)(i). In particular, records obtained from the CDCR raise disturbing questions about whether state officials have followed federal law in the importation, purchase, and transfer of the controlled substances used in executions. Release of the records requested will shed much-needed light on these troubling practices.

The requestors plan to disseminate widely to the public records disclosed as a result of this FOIA request. The ACLU-NC's communications department is a division of a nonprofit 501(c)(3) organization, and both the ACLU-NC's communications department and the *Guardian* are "representative[s] of the news media." They are well situated to disseminate information gained through this request to the public, to affected communities and to political and legal organizations. The requestors routinely obtain information about government activity (including through FOIA), analyze that information, and widely publish and disseminate that information to the press and to the public in a variety of ways including the following:

The ACLU-NC's communications department disseminates information through the website, http://www.aclunc.org, which had 477,995 page views in 2010. This website addresses civil liberties issues in depth and provides features on civil liberties issues on which the ACLU-NC is focused. As noted, the ACLU-NC posted the documents obtained from the CDCR regarding the acquisition of execution drugs on the day it received the records, December 8, 2010. Since

Drug Enforcement Administration
January 4, 2011
Page 12

posting, the page has been visited 2,835 times and viewed 2,835 times. From December 8, 2010 to December 13, 2010, it was the most frequently viewed page on the ACLU-NC website.

The ACLU-NC's communications department also publishes reporters, news briefings, right-to-know documents, and other materials that are disseminated to the public. Its material is widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost. ACLU-NC staff persons are frequent spokespersons in television and print media and make frequent public presentations at meetings and events. Finally, the ACLU-NC's communications department disseminates information through a newsletter, which is distributed to subscribers by mail. Due to these extensive publication activities, the ACLU-NC is a "representative of the news media" under the FOIA and agency regulations.

As noted, the *Guardian* is the largest circulation newsweekly in northern California, with audited weekly distribution of 100,000 copies. The paper covers breaking news, does detailed investigative reporting, publishes editorials and covers arts, entertainment, and lifestyle issues. The *Guardian* has received more than 100 state, local and national awards for journalistic excellence. The *Guardian* is a member of the California Newspaper Publishers Association and the Association of Alternative Newsweeklies.

Disclosure of the requested records is not in the requestors' commercial interest. The records requested are not sought for commercial use and the ACLU-NC plans to disseminate the information disclosed as a result of this FOIA request to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'") (citation omitted).

## IV.    News Media Status Fee Limitation Request

We also request a waiver of document reproduction fees on the grounds that the requestors qualify as "representatives of the news media" and the records are not sought for commercial use. 28 C.F.R. § 16.11(d). The *Guardian* is a newsweekly. The ACLU-NC also meets the statutory and regulatory definitions of a "representative of the news media" because they are "entit[ies] that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that "gathers information from a variety of sources," exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *cf. ACLU v. Dep't of Justice*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information").[5]

---

[5] Fees associated with responding to FOIA requests are regularly waived for the ACLU, and a number of agencies have determined that the ACLU is a "representative of the news media" for the purposes of FOIA, including the Departments of Justice, State, and Commerce. In December 2008, the Department of Justice found that the ACLU was a "representative of the news media" for the purposes of FOIA in the context of a request for documents relating to the detention, interrogation, treatment, or prosecution of suspected terrorists.

01/04/2011   16:40      4154373658                     BRUCE                           PAGE   01/04

Drug Enforcement Administration
January 4, 2011
Page 13

Notably, courts have found other organizations whose missions, functions, publishing, and public education activities are similar in kind to the ACLU's to be "representatives of the news media." *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA); *Nat'l Security Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53-54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[6]

*                    *                    *

If this request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to the FOIA. We expect the release of all segregable portions of otherwise exempt material. If the fee waivers are denied, the requesters are prepared to pay fees up to $100, and request to be informed of further fees that may be charged, but reserve the right to appeal a denial of fee waivers.

Thank you for your prompt attention to this matter. Please furnish all applicable records to Natasha Minsker, American Civil Liberties Union of Northern California, 39 Drumm Street, San Francisco, California 94111, telephone (415) 621-2493, email nminsker@aclunc.org.

Sincerely,

Natasha Minsker
Death Penalty Policy Director, ACLU-NC

Tim Redmond
Executive Editor, *San Francisco Bay Guardian*

---

[6] Courts have founds these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information/public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; *see also Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54; *see also Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (finding Leadership Conference to be primarily engaged in disseminating information even though it engages in substantial amounts of legislative advocacy beyond its publication and public education functions).

Drug Enforcement Administration
January 4, 2011
Page 14

## Certification

Pursuant to 28 C.F.R. 16.5(d)(3), I, Natasha Minsker, certify that the information in this request is true and correct to the best of my knowledge and belief.

January _____ 2011

Signed in San Francisco, California

Natasha Minsker