Michael T. Risher (CA SBN 191627)
mrisher@aclunc.org
Linda Lye (CA SBN 215584)
llye@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm St., 2nd Floor
San Francisco, California 94111
Telephone:   415-621-2493
Facsimile:   415-255-8437

Attorneys for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA and
SAN FRANCISCO BAY GUARDIAN

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA; SAN FRANCISCO BAY GUARDIAN, <br><br> Plaintiffs, <br><br> v. <br><br> DRUG ENFORCEMENT ADMINISTRATION, <br><br> Defendant. | CASE NO.: C 11-01997 RS <br><br> **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date: May 12, 2011 <br><br> Time: 1:30 pm <br><br> Dept.: Courtroom 3, 17th Floor |

1    **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

2    TO DEFENDANT AND ITS COUNSEL OF RECORD:  PLEASE TAKE NOTICE

3    THAT on May 12, 2011at 1:30 pm, or as soon thereafter as the matter may be heard, at the

4    United States District Court for the Northern District of California, in Courtroom 3, 17th

5    Floor, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs American Civil

6    Liberties Union of Northern California ("ACLU-NC") and *The San Francisco Bay*

7    *Guardian* ("*The Bay Guardian*") will, and hereby do, move for an order granting

8    preliminary injunctive relief.

9              Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs seek to preliminarily

10   enjoin the Drug Enforcement Administration ("DEA") from impeding Plaintiffs' efforts to

11   expeditiously obtain agency records about the role of the federal government in regulating,

12   or failing to regulate, the importation and acquisition of a controlled substance, sodium

13   thiopental, by states that execute inmates by lethal injection.  Plaintiffs respectfully ask

14   this Court to issue an order requiring the DEA to expedite processing of Plaintiffs'

15   Freedom of Information Act request submitted to the agency.  This motion is based on

16   Plaintiffs' Notice of Motion and Motion; Memorandum of Points and Authorities in

17   Support thereof; the Declaration of Natasha Minsker in Support of Plaintiffs' Motion, and

18   attached exhibits; the Declaration of Tim Redmond in Support of Plaintiffs' Motion; the

19   *Ex Parte* Application to Shorten Time on Plaintiffs' Motion; the Declaration of Linda Lye

20   in Support of Plaintiffs' *Ex Parte* Application, and all papers and records on file with the

21   Clerk or which may be submitted prior to or at the time of the hearing, and any further

22   evidence which may be offered.

23

24

25

26

27

28

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

1

Dated:  April 28, 2011                    Respectfully submitted,

2

By:_____/s/_____

3                                          Linda Lye

4                                          Michael T. Risher
                                           Linda Lye
5                                          AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF NORTHERN
                                           CALIFORNIA
6                                          39 Drumm Street
                                           San Francisco, CA 94111
7                                          Tel: (415) 621-2493
                                           Fax: (415) 255-8437
8
                                           Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ii

28

1

2

### Table of Contents

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND .............................................................................. 3

    A.  The use of sodium thiopental in executions ................................................ 3

    B.  Nationwide shortage of sodium thiopental and resulting delays in executions ............ 5

    C.  Extraordinary measures by states to acquire sodium thiopental ................................. 5

    D.  Plaintiff's FOIA Requests ........................................................................... 7

    E.  On-going urgency of Plaintiffs' FOIA requests .......................................... 9

III.    LEGAL STANDARD ....................................................................................... 10

IV.     ARGUMENT ................................................................................................... 11

    A.  PLAINTIFFS HAVE AN OVERWHELMING LIKELIHOOD OF SUCCESS
        ON THE MERITS OF THEIR CLAIM THAT DEA IS WRONGFULLY
        WITHHOLDING DOCUMENTS ............................................................... 11

        1. FOIA Framework ............................................................................ 12

        2. DEA has failed to meet the applicable timeline ................................ 13

    B.  PLAINTIFFS WILL SUFFER IRREPARBLE HARM FROM LOSS OF THE
        RIGHT TO OBTAIN TIMELY INFORMATION ACUTELY RELEVANT
        TO TWO IMMINENT EXECUTIONS AND VITAL TO A DEBATE OF
        NATIONAL IMPORTANCE ...................................................................... 16

    C.  THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFFS' FAVOR ..................... 19

    D.  THE PUBLIC INTEREST FAVORS THE REQUESTED RELIEF.......................... 20

V.      CONCLUSION ................................................................................................ 21

21

22

23

24

25

26

27

28

## **Table of Authorities**

**Cases**

*ACLU v. Dep't of Defense*, 339 F.Supp.2d 501 (S.D.N.Y. 2004) ................................ 16, 17

*Aguilera v. FBI,* 941 F.Supp. 144 (D. D.C. 1996) .................................................. 1, 16, 17

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ......................... 11

*American Civil Liberties Union of Northern California v. Superior Court (Real Party in Interest CDCR)*, A131111 (First District Court of Appeal) ............................................... 8

*American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) .......... 11

*Arizona v. Cook,* No. CR-88-0301-AP (Nov. 30, 2010 order) ........................................... 17

*California First Amendment Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002) ............... 18

*Cleaver v. Kelley,* 427 F.Supp. 80 (D.D.C. 1976) ............................................................. 16

*Dep't of Justice v. Reporters' Comm. for Freedom of the Press,* 489 U.S. 749 (1989) ..... 20

*Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ........................................................ 3, 13, 15, 16, 18, 19, 20

*Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 542 F.Supp.2d 1181, 1183 (N.D. Cal. 2008) ........................................................................... 3, 13, 15, 18

*Elec. Privacy Info. Ctr. v. Dept. of Justice,* 416 F.Supp.2d 30 (D. D.C. 2006) .... 11, 12, 13, 15, 16, 19, 20

*Gerstein v. CIA*, 2006 WL 3462659 (N.D. Cal. Nov. 29, 2006) ................. 3, 13, 16, 19, 20

*Gilmore v. Dep't of Energy*, 33 F.supp.2d 1184 (N.D. Cal. 1998) ................................... 15

*Jacksonville Port Auth. v. Adams,* 556 F.2d 52 (D.C. Cir. 1977) ..................................... 20

*Jorgensen v. Cassidy*, 320 F.3d 906 (9th Cir. 1997) ........................................................ 20

*Morales v. Tilton*, 465 F.Supp.2d 972 (N.D. Cal. 2006) .................................... 1, 3, 18, 19

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ........................................................... 18

*Payne Enterprises, Inc.* v. *United States*, 837 F.2d 486 (D.C. Cir. 1988) ........................ 17

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) ................... 19

*San Jose Mercury News, Inc. v. U.S. Dist. Court,* 187 F.3d 1096 (9th Cir. 1999)............ 18

*Scherr v. Volpe,* 466 F.2d 1027 (7th Cir. 1972) ............................................................... 20

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

*Temple Univ. v. White,* 941 F.2d 201 (3d Cir. 1991) ........................................................ 20

*United States v. Rx Depot, Inc.,*  290 F.Supp.2d 1238 (N.D. Okla. 2003) ................... 3, 17

*Vermont v. Leavitt*, 405 F.Supp.2d 466 (D.Vt. 2005) .................................................... 3, 17

**Statutes**

5 U.S.C. §522(a)(6)(A)(ii).................................................................................................. 12

5 U.S.C. §522(a)(6)(C)(i) .................................................................................................. 13

5 U.S.C. §552 (a)(6)(E) ................................................................................................. 2, 12

5 U.S.C. §552(a)(6)(A) ........................................................................................................ 2

5 U.S.C. §552(a)(6)(A)(i) ............................................................................................. 12, 15

5 U.S.C. §552(a)(6)(B)(i) ............................................................................................. 12, 15

5 U.S.C. §552(a)(6)(C)(i) ............................................................................................... 1, 14

5 U.S.C. §552(a)(6)(E)(i) .................................................................................................. 12

5 U.S.C. §552(a)(6)(E)(iii) ................................................................................................ 12

5 U.S.C. §552(a)(6)(E)(v)(II) ............................................................................. 8, 12, 14, 20

21 U.S.C. §§ 841, 952 ........................................................................................................ 4

21 U.S.C. §801 .................................................................................................................... 4

21 U.S.C. §812(b)(3) ........................................................................................................... 4

21 U.S.C. §829(b) ............................................................................................................... 4

21 C.F.R. §1312.11(b) ........................................................................................................ 4

21 C.F.R. §1312.11(c) ........................................................................................................ 4

21 C.F.R. §207.40(b) .......................................................................................................... 4

28 C.F.R. §§16.5(d)(4) ...................................................................................................... 12

28 C.F.R. §0.1 .................................................................................................................... 12

28 C.F.R. §16.5(d)(1)(ii) ...................................................................................... 8, 12, 14

28 C.F.R. §16.5(d)(1)(iv) ..................................................................................... 8, 12, 14

Cal. Gov. Code §6250 ......................................................................................................... 6

15 Cal. Code Regs. § 3349.1.1(q) ....................................................................................... 3

15 Cal. Code Regs. §§3349.4.5(g)(5)(A), (B).................................................................... 3

**Other Authorities**

Pub. L. No. 104-231 §8 ........................................................................ 12

H.R. Rep. No. 93-876 (1974) .............................................................. 17

S. Rep. No. 104-272, at 17 (1996)....................................................... 13

1974 U.S.C.C.A.N. 6267, 6271............................................................ 17

DEA, OFFICE OF DIVERSION CONTROL, CONTROLLED SUBSTANCES BY CSA SCHEDULE 9

    (Jan. 18, 2011) ............................................................................. 4

DEA, OFFICE OF DIVERSION CONTROL, CONTROLLED SUBSTANCES IMPORT/EXPORT

    DECLARATION FORM 236 (Apr. 1988),

    http://www.deadiversion.usdoj.gov/imp_exp/236/236_blank.pdf ................................. 4

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

Plaintiffs seek a preliminary injunction to enforce the public's right to timely information under the Freedom of Information Act ("FOIA") about the federal government in regulating, or failing to regulate, the importation and acquisition of a controlled substance, sodium thiopental, by states that execute inmates by lethal injection. Plaintiffs' FOIA requests are highly time sensitive.  The information wrongfully withheld by Defendant DEA bears directly on two imminent executions – one in Arizona scheduled for May 25, 2011, and another in Nebraska scheduled for June 14, 2011.  A preliminary injunction is necessary so that Plaintiffs and the public have timely access to information vital to understanding the federal government's involvement in these executions and to the on-going debate about the death penalty in our society.  *See Morales v. Tilton*, 465 F.Supp.2d 972, 973 (N.D. Cal. 2006) ("Few issues in American society have generated as much impassioned debate as the death penalty.").  Defendant Drug Enforcement Administration ("DEA") *has agreed* that Plaintiffs' requests are entitled to expedited processing, yet it failed for over 100 days even to make an initial determination of whether to comply.  Plaintiffs therefore request an order from this Court preliminarily enjoining Defendant from continuing to wrongfully deny the expeditious processing to which Plaintiffs are statutorily entitled.

The records at issue involve sodium thiopental, a federally controlled substance that nearly all states with the death penalty use as part of the execution process, usually in conjunction with two other drugs.  Beginning last year, a nationwide shortage of thiopental set off a scramble by corrections officials across the country to acquire supplies of the drug.  Many states resorted to unconventional means, including importing the drug from foreign countries and trading drugs with other states.  The legality of those efforts is questionable, as the Controlled Substances Act imposes tight restrictions on its importation and distribution.  In addition, imported drugs are often of inferior quality,

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

raising the specter that their use in an execution will cause an inmate to suffer excruciating pain, in violation of the Eighth Amendment, in those states that use thiopental as the first drug in the lethal injection protocol.

Over the last several months, Defendant DEA has seized the entire supply of sodium thiopental of at least four states, based on questions about the legality of the importation of the drug by states from the United Kingdom.  Nevertheless, last week, Arizona, which also acquired its supply from the United Kingdom, and Nebraska, which acquired its supply from an Indian company that concededly lacks a DEA import license, set imminent execution dates.  There is an urgent need to learn more about the importation of drugs which Arizona and Nebraska intend to use in executions *before* those executions occur.  The need for the information sought in Plaintiffs' FOIA requests is rendered particularly pressing by, but extends beyond, the imminent executions in Arizona and Nebraska.

Defendant DEA agrees that Plaintiffs' requests under FOIA are entitled to expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E), yet almost four months passed without so much as an initial determination by DEA whether to comply with the request, or even an indication when it would provide such a determination.  After filing suit but before filing this motion, Plaintiffs attempted to negotiate a processing schedule with Defendant.  Although Defendant was willing to produce some records before the imminent executions, it was unwilling to commit to completing its processing of Plaintiffs' requests by a date certain.  In violation of FOIA and controlling Department of Justice regulations, Defendant DEA has failed to process Plaintiffs' requests even within the 20 working day statutory time frame (5 U.S.C. §552(a)(6)(A)) governing a standard request that is *not* entitled to expedited processing.

Plaintiffs therefore seek a preliminary injunction requiring DEA to process and disclose records relating to Arizona by May 16, 2011, the week before the scheduled Arizona execution, and to complete the remainder of Plaintiffs request by June 7, 2011, one week before the scheduled Nebraska execution.  Three courts of this district have

1  granted preliminary injunctions where, as here, the agency agreed to expedited processing

2  but failed to complete processing within the 20 working day time frame applicable to

3  ordinary, non-expedited requests.  *See Elec. Frontier Found. v. Office of the Dir. of Nat'l*

4  *Intelligence*, 542 F.Supp.2d 1181, 1183, 1187 (N.D. Cal. 2008) (White, J.) ("*EFF II*");

5  *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 2007 WL 4208311, at *2,

6  *8 (N.D. Cal. Nov. 27, 2007) (Illston, J.) ("*EFF I*"); *Gerstein v. CIA*, 2006 WL 3462659,

7  at *2, *5 (N.D. Cal. Nov. 29, 2006) (Chesney, J.).  Those decisions compel the same result

8  here.

9  **II.      FACTUAL BACKGROUND**

10          **A.      The use of sodium thiopental in executions**

11          Efforts by states to import sodium thiopental for lethal injection raise sharp

12  questions about the death penalty.  California and 29 other states use sodium thiopental as

13  part of a three-drug protocol for executing condemned inmates by lethal injection.  *See,*

14  *e.g.,* 15 Cal. Code Regs. §§3349.1.1(q), 3349.4.5(g)(5)(A), (B); Decl. of Natasha Minsker

15  ISO PI at ¶4.  Sodium thiopental plays a crucial role in executions.  It is the first drug

16  administered and is intended to anesthetize the inmate from experiencing what a federal

17  court has held would otherwise be excruciating, potentially unconstitutional pain.

18  *Morales v. Tilton*, 465 F.Supp.2d 972, 975 (N.D. Cal. 2006).

19          Because sodium thiopental is all that stands between a condemned inmate and

20  enormous physical suffering, its quality bears directly on the legality of executions.  But

21  "drugs imported from foreign countries by someone other than the U.S. manufacturer do

22  not have the same assurance of safety and efficacy" as drugs manufactured domestically,

23  "may be contaminated, counterfeit, or contain erratic amounts of the active ingredient,"

24  and "may have been held under uncertain storage conditions, and therefore be outdated or

25  subpotent."  *United States v. Rx Depot, Inc.*,  290 F.Supp.2d 1238, 1241-42 (N.D. Okla.

26  2003); *see also Vermont v. Leavitt*, 405 F.Supp.2d 466, 472 (D.Vt. 2005) (Food and Drug

27  Administration "cannot provide adequate assurance that the drug products . . . from

28

3

foreign countries are the same products approved by FDA or that they are safe and effective for their intended uses")  (quoting FDA position).

In addition, sodium thiopental is a highly regulated controlled substance; anybody, including government officials, that import, distribute, or use the drug must comply with the detailed requirements of the Controlled Substances Act, 21 U.S.C. §801 *et seq*. Details about the process by which a state acquires the drug sheds light on whether the state has fully complied with the law in undertaking to conduct an execution and its overall integrity in implementing the death penalty.  More specifically, sodium thiopental is a Schedule III controlled substance.  *See* 21 U.S.C. §812(b)(3).[1]  Sodium thiopental may only be dispensed directly by a medical practitioner to an ultimate user, or by a written or oral prescription.  *See* 21 U.S.C. §829(b).  Moreover, strict requirements govern its importation.  It is a violation of federal law for any person to "import or cause to be imported" sodium thiopental unless that person is registered (or exempt from registration), and has filed an import declaration with the DEA.  *See* 21 C.F.R. §1312.11(b); *see also* 21 C.F.R. §207.40(b) ("No drug may be imported or offered for import into the United States unless it is listed as required in subpart C of this part and manufactured, prepared, propagated, compounded, or processed at a registered foreign drug establishment").  Further, "a separate permit or declaration must be obtained for each consignment of controlled substances to be imported."  21 C.F.R. §1312.11(c).  The import declaration, DEA Form 236, requires the importer to certify that the substance imported will be used for a "[l]egitimate medical need" or "[s]cientific research."  *See* DEA, OFFICE OF DIVERSION CONTROL, CONTROLLED SUBSTANCES IMPORT/EXPORT DECLARATION FORM 236 (Apr. 1988), http://www.deadiversion.usdoj.gov/imp_exp/236/236_blank.pdf. Unlawful importation, distribution, or dispensation of the drug is a criminal offense.  *See* 21 U.S.C. §§ 841, 952.

---

[1] *See also* DEA, OFFICE OF DIVERSION CONTROL, CONTROLLED SUBSTANCES BY CSA SCHEDULE 9 (Jan. 18, 2011), http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf.

**B.** **Nationwide shortage of sodium thiopental and resulting delays in executions**

In May 2010, it came to light that sodium thiopental was no longer available due to production problems with the only domestic supplier of the drug approved by the FDA, and that this nationwide shortage was causing delays in executions in some states. These revelations were widely reported in the media. *See* Minsker Decl. at ¶6 & Exh. 1.

An execution in California, for example, scheduled for September 30, 2010, was delayed in part because the state's supply of sodium thiopental expired on October 1, 2011, and the state was unable to acquire a new supply of the controlled substance. The issue generated enormous media coverage in the state and nationally. *See id.* at ¶8 and Exh. 3.

As the shortage began to impact executions, attorneys, community members, and journalists began asking questions and expressing concern over how state corrections officials would obtain sodium thiopental, whether government officials would violate any state or federal law in their effort to obtain the drug, the efficacy of the drugs in their possession, and what other steps officials might take in order to proceed with executions. *See id.* at ¶7 & Exh. 2.

**C.** **Extraordinary measures by states to acquire sodium thiopental**

At the end of September 2010, the state of Arizona suddenly acquired a new supply of sodium thiopental, and ultimately acknowledged that it had imported the drug from the United Kingdom. The origin and legality of the Arizona drug became the focus of an intense legal battle with extensive local, national and international media coverage. Although Arizona carried out two executions using the sodium thiopental imported from the United Kingdom, the Arizona Supreme Court subsequently delayed an execution due to questions about the origin and efficacy of the drug. *See id.* at ¶9 & Exh. 4.

On October 6, 2010, the California Department of Corrections and Rehabilitation ("CDCR") disclosed that it, too, had recently obtained 12 grams of sodium thiopental, with an expiration date of 2014, despite the nationwide shortage. The CDCR did not

1    disclose the source of the drug or explain how it came into possession of the scarce

2    substance, but the evidence pointed overseas, as the last supply of sodium thiopental

3    produced domestically had an expiration date of 2011, three years earlier. *See id.* at ¶10 &

4    Exh. 5.

5         On October 7, 2010, Plaintiff ACLU-NC sent a request under the California Public

6    Records Act, Cal. Gov. Code §6250 *et seq.*, for records regarding the CDCR's acquisition

7    of the drug.  After CDCR failed to produce responsive records, Plaintiff filed suit, and on

8    November 30, the superior court ordered production of all records as to which CDCR

9    claimed no exemption from disclosure, giving the government one week to comply.  On

10   December 8, 2010, CDCR produced approximately 1,000 pages of heavily redacted

11   documents.  CDCR also withheld approximately 120 documents. *See id.* at ¶11 & Exh. 6.

12        The records produced by CDCR revealed that California corrections officials had

13   gone to great lengths in their search for the drug, including attempting initially to import it

14   from Pakistan, actually exchanging lethal injection drugs with Arizona (pancuronium

15   bromide for imported sodium thiopental), and following the lead of their Arizona

16   counterparts in importing California's own supply from the United Kingdom. *See id.* at

17   ¶12.[2]

18        Plaintiff ACLU-NC posted the records produced by CDCR to its website promptly

19   upon receipt.  The records obtained and disseminated by Plaintiff ACLU-NC have been

20   viewed thousands of times, and generated widespread media coverage in California,

21   nationally, and internationally. *See id*. at ¶¶14, 16 & Exh. 8.

22        The records obtained from CDCR reveal that state officials imported a controlled

23   substance from abroad and also obtained it from another state through a "drug swap,"

24   raising questions about whether California corrections officials have complied with the

25

26   _____

27   [2] Separate from the record production, CDCR revealed to selected journalists in December
     2010 that it had ordered 521 grams of sodium thiopental manufactured by a company in
     the United Kingdom, which had arrived in the United States and was at the time awaiting
28   inspection by the FDA. *See id.* at ¶13 & Exh. 7.

strict dictates of the federal law in their efforts to execute condemned inmates.  *See id.* at
¶¶12, 15.

At least nine states have obtained imported sodium thiopental.  California and
Arizona, along with Arkansas, Georgia, South Carolina, and Tennessee imported sodium
thiopental from a distributor in the United Kingdom, Dream Pharma in 2010.  A private
company in the state of Georgia also provided some of the imported sodium thiopental to
prison officials in Kentucky.  Two other states, Nebraska and South Dakota, imported a
controlled substance purporting to be sodium thiopental from a company in India.  *See id.*
at ¶17 & Exh. 9.

The fact that state officials, in California and elsewhere, have been importing
sodium thiopental from the United Kingdom has generated significant public outcry, legal
challenges, and media attention, both in the United Kingdom, and in the United States.
Following disclosure that states in the United States were acquiring execution drugs from
sources in the United Kingdom, the government of the United Kingdom imposed new
restrictions preventing the export of sodium thiopental for purposes of execution.  *See id.*
at ¶18 & Exh. 10.

### D.      Plaintiff's FOIA Requests

While the records produced by CDCR in response to Plaintiff ACLU-NC's Public
Records Act request revealed much about the conduct of California corrections officials,
wide gaps in the full story remain.  The records revealed that, in the course of their efforts
to import the drug from abroad, California corrections officials communicated with
various officials at Defendant DEA.  Those records raised serious questions about the role
of federal government officials in the importation of execution drugs by states, and about
whether federal officials are following the law.  CDCR, however, redacted and withheld
substantial portions of the records relating to its communications with DEA, including a
list of importers approved by the DEA.  Whether those records and redactions are exempt
from disclosure under the California Public Records Act is now pending before the
California Court of Appeal in *American Civil Liberties Union of Northern California v.*

1   *Superior Court (Real Party in Interest CDCR)*, A131111 (First District Court of Appeal).

2   *See id.* at ¶19.

3       On January 4, 2011, Plaintiffs ACLU-NC and *The Bay Guardian*, a prize-winning

4   newspaper that has published repeatedly on state efforts to acquire sodium thiopental,

5   submitted requests to Defendant DEA under FOIA for records created since January 1,

6   2010 of internal DEA communications and external communications with state officials

7   (including states other than California), other federal agencies, private individuals, or

8   persons outside the United States, relating to the importation from another country,

9   transfer between states, and purchase of sodium thiopental, and/or the two other drugs in

10   the lethal injection protocol (pancuronium bromide and potassium chloride) for the

11   purpose of execution.  Plaintiffs also sought records of any actual importation, transfer

12   between states, or purchase of sodium thiopental, pancuronium bromide and/or potassium

13   chloride for the purpose of execution.  Finally, Plaintiffs sought a list of approved

14   importers of sodium thiopental provided by DEA to CDCR.  *See id.* at ¶20 & Exh. 11;

15   Decl. of Tim Redmond ISO PI at ¶¶2, 5-6.

16       Plaintiffs' January 4, 2011 requests also sought expedited processing on the

17   ground that Plaintiffs ACLU-NC and *The Bay Guardian* are "primarily engaged in

18   disseminating information" and there is an "urgency to inform the public concerning

19   actual or alleged Federal Government activity."  5 U.S.C. §552(a)(6)(E)(v)(II); 28 C.F.R.

20   §16.5(d)(1)(ii); *see also* Minsker Decl. at ¶21 & Redmond Decl. at ¶¶2, 7.  Plaintiffs'

21   request for expedited processing was further based on the fact that the request involves

22   "[a] matter of widespread and exceptional media interest in which there exist possible

23   questions about the government's integrity which affect public confidence."  28 C.F.R.

24   §16.5(d)(1)(iv).  Plaintiffs attached 139 media articles about efforts by states to acquire

25   controlled substances for purposes of execution to demonstrate the widespread and

26   exceptional medial interest in the subject of their FOIA requests.  *See* Minsker Decl. at

27   ¶21.

28

8

1    By letter dated January 12, 2011, DEA acknowledged receipt of Plaintiffs' request.

2    *See id.* at ¶22 & Exh. 12.  By letter dated January 18, 2011, DEA *granted* Plaintiffs'

3    request for expedited processing.  *See id.* at ¶23 & Exh. 13.

4    More than twenty working days passed from DEA's receipt of Plaintiffs' requests,

5    without the production of any records.  On February 25, 2011, Plaintiff ACLU-NC made a

6    telephonic inquiry to DEA about the status of Plaintiffs' request.  *See id.* at ¶24.  In a letter

7    dated March 9, 2011, DEA "apologize[d] for the delay in the processing of [Plaintiffs']

8    request" and informed Plaintiffs that they would be "notified of [DEA's] initial

9    determination by correspondence at a later date."  *See id.* at ¶25 & Exh. 14.  But the letter

10   did not identify a date by which DEA would make an initial determination, or a reason,

11   specific to this case, for the delay.  *See id.*  On April 7, 2011, Plaintiff ACLU-NC made a

12   further telephonic inquiry as to the status of the request, but as of the filing of the

13   Complaint in this action, received no further communication from DEA about their

14   January 4, 2011 requests.  *See id.* at ¶¶26-27.

15   **E.     On-going urgency of Plaintiffs' FOIA requests**

16   Developments subsequent to Plaintiffs' January 4, 2011 requests underscore the

17   on-going urgency of the information sought.  DEA has since seized imported sodium

18   thiopental intended to be used in executions from at least four states: Georgia, Kentucky,

19   Tennessee, and South Carolina.  The supply in all four of these states originated with

20   United Kingdom distributor Dream Pharma.  The DEA has stated publicly that the drugs

21   were seized as part of an ongoing investigation.  Three states that also obtained their

22   sodium thiopental from Dream Pharma, however, Arizona, Arkansas, and California,

23   continue to maintain possession of the imported drug.  *See id*. at ¶¶17, 31 & Exhs. 9, 16.

24   On April 19, 2011, Arizona set an execution date for May 25, 2011.  *See id.* at ¶32

25   & Exh. 17.

26   Two days later, on April 21, 2011, Nebraska set an execution for June 14, 2011.

27   Nebraska possesses and apparently intends to use an imported controlled substance

28   purporting to be sodium thiopental that was acquired from an Indian company, Kayem

9

1  Pharmaceutical Pvt. Ltd.  Questions have been raised as to whether the substance is in fact

2  sodium thiopental.  In addition, the owner of Kaymen Pharmaceutical has publicly stated

3  that his company is not licensed by the DEA to import controlled substances into the

4  United States.  *See id.* at. ¶33 & Exh. 18.

5        Plaintiffs learned of the Arizona execution on April 20, 2011.  Two days later, on

6  April 22, 2011, Plaintiffs learned of the Nebraska execution.  Plaintiffs filed and served

7  this suit later that same day.  *See* Declaration of Linda Lye ISO *Ex Parte Application* at

8  ¶5.

9        After filing the Complaint and before filing this motion, Plaintiffs attempted to

10  negotiate with Defendant a processing schedule for production of records *before* the

11  executions.  Although it initially appeared Defendant would agree to produce records

12  before the executions, Defendant ultimately indicated that, while it would commit to

13  producing some records, it was unable to commit to completing processing of the requests

14  by any date certain.  *See id.* at ¶¶6-11.

15        In particular, DEA indicated that while it could commit to producing records as to

16  which it was the "originating entity," it would not commit to producing records by a date

17  certain where another agency created a document, as it would first need to consult with

18  that agency.  DEA indicated that as of April 27, 2011, all requests for consultation to third

19  parties had been made, but counsel for DEA was uncertain how much earlier those

20  requests had been initiated.  *See id.* at ¶¶12-13.

21        Plaintiffs remain open to resolving this matter without the need for a hearing, but

22  felt it necessary to file this motion to provide as much advance notice for Defendant and

23  the Court as possible, if the parties are not able to resolve the issue.  If any resolution is

24  reached, Plaintiffs will promptly notify the Court to avoid unnecessary expenditure of

25  judicial resources.  *See id.* at ¶15.

26  **III.    LEGAL STANDARD**

27        To obtain a preliminary injunction, a plaintiff must show that it "is likely to

28  succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of

1   preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in

2   the public interest." *American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046,

3   1052 (9th Cir. 2009) (citation omitted).  Under the Ninth Circuit's sliding scale approach,

4   "serious questions going to the merits and a balance of hardships that tips sharply towards

5   the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also

6   shows that there is a likelihood of irreparable injury and that the injunction is in the public

7   interest."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.

8   2011) (internal quotation marks omitted).

9   **IV.    ARGUMENT**

10          Plaintiffs have an overwhelming likelihood of success on the merits of the discrete

11   legal issue before this Court – whether Defendant DEA has violated its statutory

12   obligations to process Plaintiffs' FOIA requests in a timely manner where it has conceded

13   that the requests are entitled to expedited processing yet failed to comply with the

14   timelines applicable to standard requests.

15   Plaintiffs will suffer irreparable harm if the information is not produced immediately:  In

16   addition to providing critical information about executions in Arizona scheduled for May

17   25, 2011, and in Nebraska for June 14, 2011, the information is of vital importance to an

18   on-going, constantly evolving national debate about the death penalty, a debate which will

19   not pause while DEA delays.  The remaining factors also weigh heavily in Plaintiffs'

20   favor.

21          **A.    PLAINTIFFS HAVE AN OVERWHELMING LIKELIHOOD OF
                    SUCCESS ON THE MERITS OF THEIR CLAIM THAT DEA IS**
22          **WRONGFULLY WITHHOLDING DOCUMENTS**

23          Because DEA has failed to meet the 20 working day timeline applicable standard

24   requests, it has presumptively violated the timelines governing this expedited request.

25   *See, e.g., Elec. Privacy Info. Ctr. v. Dept. of Justice,* 416 F.Supp.2d 30, 39 (D. D.C. 2006)

26   ("*EPIC*").

27   ///

28   ///

1

### 1. FOIA Framework

2       FOIA ordinarily requires agencies to "determine … whether to comply with [a]

3  request" within 20 working days of receipt.  5 U.S.C. §552(a)(6)(A)(i).  Where "unusual

4  circumstances" exist, the agency may extend by no more than 10 working days the period

5  for determining whether to comply but must provide written notice of any such extension.

6  *See* 5 U.S.C. §552(a)(6)(B)(i).  Administrative appeals of any adverse determination must

7  be acted upon within 20 days.  *See* 5 U.S.C. §522(a)(6)(A)(ii).

8       In 1996, Congress amended FOIA to provide, among other things, for "expedited

9  processing" of certain requests.  See Electronic Freedom of Information Act Amendments

10  of 1996 ("EFOIAA"), Pub. L. No. 104-231 §8, 110 Stat. 3048 (1996), codified at 5 U.S.C.

11  §552(a)(6)(E).  Agencies are required to promulgate regulations providing for expedited

12  processing of records "in cases in which the person requesting the records demonstrates a

13  compelling need" and "in other cases determined by the agency."  5 U.S.C.

14  §552(a)(6)(E)(i).  "[C]ompelling need" means "with respect to a request made by a person

15  primarily engaged in disseminating information, urgency to inform the public concerning

16  actual or alleged Federal Government activity."  5 U.S.C. §552(a)(6)(E)(v)(II); *see also* 28

17  C.F.R. §16.5(d)(1)(ii).  Department of Justice regulations also state that FOIA requests are

18  entitled to expedited processing when the information requested involves "[a] matter of

19  widespread and exceptional media interest in which there exist possible questions about

20  the government's integrity which affect public confidence."  28 C.F.R. §16.5(d)(1)(iv). [3]

21       Requests that have been granted expedited processing must be processed "as soon

22  as practicable."  5 U.S.C. §552(a)(6)(E)(iii); *see also* 28 C.F.R. §§16.5(d)(4).  The courts

23  of this District have been unanimous in concluding that when "an agency … violates the

24  twenty-day deadline applicable to standard FOIA requests[, it] presumptively also fails to

25  process an expedited request 'as soon as practicable.'"  *EPIC*, 416 F.Supp.2d at 39;

26  *accord Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 542 F.Supp.2d

27

28
_____

[3] These regulations apply to Defendant DEA because it is a component of the Department of Justice.  28 C.F.R. §0.1.

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

1181, 1186 (N.D. Cal. 2008) (White, J.) ("*EFF II*"); *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 2007 WL 4208311, at *5 (N.D. Cal. Nov. 27, 2007) (Illston, J.) ("*EFF I*"); *Gerstein v. CIA*, 2006 WL 3462659, at *3 (N.D. Cal. Nov. 29, 2006) (Chesney, J.).  This presumption implements Congress' intent in enacting the 1996 amendments to FOIA, which was to "give the [expedited] request priority for processing *more quickly than otherwise would occur*."  *EPIC*, 416 F.Supp.2d at 39 (emphasis in original) (citing S. Rep. No. 104-272, at 17 (1996)).  "[T]he phrase 'as soon as practicable,' in the context of a provision of FOIA allowing for *expedited* processing, cannot be interpreted to impose a lower burden on the agency than would otherwise exist."  *EPIC*, 416 F.Supp.2d at 39 (emphasis in original).

While an agency can seek additional time to process an expedited request pursuant to 5 U.S.C. §522(a)(6)(C)(i), the agency must "present[] credible evidence that disclosure within [twenty days] is truly not practicable."  *EPIC*, 416 F.Supp.2d at 39; *see id.* at 40 ("unsupported allegations that delay is necessary" insufficient to meet government's burden).  Arguments about backlogs and understaffing that are "generically applicable to all FOIA requests" do not suffice to meet the government's burden of demonstrating impracticability in an expedited processing case.  *EFF II*, 542 F.Supp.2d at 1186.  Rather, in such cases, the government must establish "the existence of 'exceptional circumstances' specific to this case."  *EFF I*, 2007 WL 4208311, at *6; *see id.* at *5-*6 (government's assertions regarding, *inter alia*, size and scope of request, need for line-by-line review were "generically applicable to all FOIA requests that would be received" by agency).

### 2.    DEA has failed to meet the applicable timeline

Plaintiffs are likely to succeed on the merits of their claim that DEA is wrongfully withholding documents because DEA has failed to meet the timelines governing this expedited request.  Defendant DEA acknowledged receipt of Plaintiffs request on January

///

///

///

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

12, 2011.  Over 100 days have passed since that time, and yet DEA has failed to process Plaintiffs' requests.[4]

       1.      DEA has agreed that Plaintiffs are entitled to expedited processing.  *See* Minsker Decl. at ¶23 & Exh. 13 (DEA January 18, 2011 letter).  That determination was correct for two reasons.  First, the requests sought information about the federal government's role in overseeing the importation of a controlled substance for the purpose of executions – raising questions of the extent to which DEA was properly carrying out its statutory mandate to enforce the federal controlled substance laws.  This is thus a matter about which there is an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. §552(a)(6)(E)(v)(II); *see also* 28 C.F.R. §16.5(d)(1)(ii).  Plaintiffs, moreover, a public interest organization dedicated to, among other things, open government, and a newspaper, are "primarily engaged in disseminating information."  5 U.S.C. §552(a)(6)(E)(v)(II); 28 C.F.R. §16.5(d)(1)(ii); *see also* Minsker Decl. at ¶2 & Redmond Decl. at ¶2.

      Second, the revelations of states importing controlled substances, some potentially without the requisite import licenses, have generated "widespread and exceptional media interest" and raised "questions about the government's integrity which affect public confidence."  28 C.F.R. §16.5(d)(1)(iv); *see* Minsker Decl. at ¶21 & Exh. 1-8, 10 (Plaintiffs' requested for expedited processing supported by 139 media articles).  Plaintiffs' FOIA requests seek to unearth additional information that will shed light on the lengths to which states have resorted in attempting to secure the drugs necessary for lethal injection, whether they have complied with federal law in so doing, and whether the Defendant DEA has properly executed its duties in overseeing that process.

       2.      But despite Plaintiffs' undisputed entitlement to expedited processing, more than 100 days passed since DEA received Plaintiffs' requests,[5] yet no documents

---

[4] Plaintiffs have constructively exhausted all applicable administrative remedies given the passage of time.  *See* 5 U.S.C. §552(a)(6)(C)(i); *see also EFF II,* 416 F.Supp.2d at 36 (constructive exhaustion where agency fails to satisfy statutory requirement of determining within 20 working days whether to comply with FOIA request).

1   were forthcoming.  *See* 5 U.S.C. §552(a)(6)(A)(i) (agency "*shall* … determine within 20

2   [working] days … whether to comply") (emphasis added).

3         Having failed to meet the 20 day deadline applicable to standard FOIA requests,

4   DEA has presumptively failed to meet the statutory deadline for processing this expedited

5   request "as soon as practicable."  *EPIC,* 416 F.Supp.2d at 39; *see also Gilmore v. Dep't of*

6   *Energy*, 33 F.Supp.2d 1184, 1187 (N.D. Cal. 1998) ("an agency's failure to comply with

7   the FOIA's time limits is, by itself, a violation of the FOIA, and is an improper

8   withholding of the requested documents").

9         While an "agency may rebut the presumption by demonstrating that the twenty-day

10  time period is 'truly not practicable,'" *EFF II,* 542 F.Supp.2d at 1186, DEA has failed to

11  meet its rebuttal burden.  In "apologiz[ing] for the delay in the processing of [Plaintiffs']

12  request," DEA explained only that it "continue[s] to experience a large volume of

13  incoming FOI/PA requests that has adversely impacted [its] response time to the public."

14  *See* Minsker Decl. at ¶25 & Exh. 14 (DEA March 9, 2011 letter).  Moreover, to the extent

15  DEA contends that it must first consult with other entities to complete processing of

16  records, *cf.* Lye Decl. at ¶12, it is hardly extraordinary that a FOIA request would include

17  documents authored or created by other entities.   DEA's backlog and consultation

18  arguments are "generically applicable to all FOIA requests," *EFF II*, 542 F.Supp.2d at

19  1186, and thus do not satisfy DEA's burden, in this expedited matter, of establishing "the

20  existence of 'exceptional circumstances' *specific to this case*."  *EFF I*, 2007 WL 4208311,

21  at *6 (emphasis added).

22        Numerous courts, including three in this District, have issued preliminary

23  injunctions requiring the agency to produce records by a date certain where, as here,

24  expedited processing had been granted by the agency, but it still failed to process the

25  request within the statutory time frame applicable to standard FOIA requests.  *See EFF II*,

26  542 F.Supp.2d at 1187 (ordering final production of non-exempt documents and affidavit

27  attesting to compliance and setting forth basis for withholding any responsive documents

28  _____

[5] DEA has not granted itself a ten-day extension pursuant to 5 U.S.C. §552(a)(6)(B)(i).

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

within 17 days after issuance of preliminary injunction); *EFF I*, 2007 WL 4208311, at *8 (ordering initial release of documents within 3 days of issuance of preliminary injunction and final release of documents and affidavit setting forth basis for withholding any responsive documents within 13 days); *Gerstein*, 2006 WL 3462659, at *5 (ordering production of all non-exempt responsive records within 30 days of issuance of preliminary injunction); *EPIC*, 416 F.Supp.2d at 43 (ordering production of responsive records within 20 days of issuance of preliminary injunction and Vaughn index within 30 days).[6]  These cases are directly on point.

### B.   PLAINTIFFS WILL SUFFER IRREPARBLE HARM FROM LOSS OF THE RIGHT TO OBTAIN TIMELY INFORMATION ACUTELY RELEVANT TO TWO IMMINENT EXECUTIONS AND VITAL TO A DEBATE OF NATIONAL IMPORTANCE

Plaintiffs will suffer irreparable harm from DEA's further interference with their timely access to information that bears directly on executions scheduled in Arizona for May 25, 2011 and in Nebraska for June 14, 2011, and that informs the on-going debate about the death penalty in our society.

1.   Plaintiffs seek information about DEA's communications with state officials regarding their efforts to import sodium thiopental from foreign sources. Plaintiffs will suffer irreparable harm if they are unable to obtain records pertaining to DEA's communications with Arizona and Nebraska officials *before* the executions in those states go forward.  Arizona obtained its sodium thiopental from United Kingdom distributor Dream Pharma.  Nebraska obtained its supply from an Indian company that concededly does not have a DEA import license.  *See* Minsker Decl. at ¶¶31, 33.  The

---

[6] Even in cases where the agency *denied* expedited processing, courts have ordered expedited processing and production of documents by a date certain.  *See, e.g., ACLU v. Dept. of Defense*, 339 F.Supp.2d 501 (S.D.N.Y 2004) (ordering production of documents within 30 days of court order where two of four agency components denied request for expedited processing).  Courts have also ordered production by a date certain in cases brought prior to the 1996 FOIA amendments creating a statutory expedited processing procedure.  *See, e.g., Aguilera v. FBI*, 941 F.Supp. 144 (D. D.C. 1996) (ordering production of documents and *Vaughn* index within one month of court order); *Cleaver v. Kelley*, 427 F.Supp. 80, 82 (D. D.C. 1976) (issuing preliminary injunction requiring response to FOIA within 21 days due to "exceptional and urgent need").

1   quality and efficacy of imported drugs is uncertain.  *See Vermont v. Leavitt*, 405

2   F.Supp.2d at 472; *Rx Depot,* 290 F.Supp.2d at 1241-42.  After questions arose surrounding

3   the legality of the drug's importation, the Arizona Supreme Court delayed an execution,

4   albeit temporarily, on one occasion, and the DEA seized the entire sodium thiopental

5   supply of four states that obtained the drug, directly or indirectly, from United Kingdom

6   distributor Dream Pharma.  *See* Minsker Decl. at ¶¶9, 31; *Arizona v. Cook,* No. CR-88-

7   0301-AP (Nov. 30, 2010 order), attached as Appendix.

8          The records sought here could affect the availability of a stay of the Arizona and

9   Nebraska executions.  In *Aguilera v. FBI,* 941 F.Supp. 144 (D. D.C. 1996), the court

10   found irreparable harm from the FBI's delay in producing records that could have led to

11   the reversal of an inmate's conviction.  As the court explained, "[i]t would be difficult – if

12   not impossible – to adequately ameliorate the harm he would have sustained by virtue of

13   his incarceration for that extensive and, indeed, unwarranted period of time."  *Id.* at 152.

14   The irreparable harm here is far more acute.  Execution, not incarceration, is imminent.

15          Separate and independent from the role of this information in legal proceedings in

16   Arizona and Nebraska, the records sought play a vital part in media coverage of and

17   public debates about those executions.  Congress recognized that delay in complying with

18   FOIA requests may be "tantamount to denial."  H.R. Rep. No. 93-876 (1974), *reprinted in*

19   1974 U.S.C.C.A.N. 6267, 6271.  "[S]tale information is of little value…."  *Payne Enters.,*

20   *Inc.* v. *United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).  FOIA's statutory scheme is

21   premised on "the timeliness of disclosure."  *ACLU v. Dep't of Defense*, 339 F.Supp.2d at

22   504.

23          The records sought will shed light on whether DEA officials – which seized drugs

24   imported from UK distributor Dream Pharma from four other states – are derelict in

25   enforcing the law by allowing Arizona to retain possession of drugs from the identical

26   source.  This issue is highly newsworthy.  *See* Redmond Decl. at ¶10.  Equally

27   newsworthy is whether DEA officials have been derelict in enforcing the law by allowing

28   importation of a controlled substance from an Indian company that publicly states it does

1  not have authorization to export such drugs to the U.S.  *See id.* at ¶11.  The media has a

2  right to report on these issues, and the public a right to debate them, *before* the drugs at

3  issue are used in another execution.  *See id.* at ¶12; *San Jose Mercury News, Inc. v. U.S.*

4  *Dist. Court,* 187 F.3d 1096, 1099 (9th Cir. 1999) (given "perishable nature of news,"

5  delay in access to records requested by the press "can constitute an irreparable injury");

6  *EFF II,* 542 F.Supp.2d at 1187 (irreparable harm where records "may enable the public to

7  participate meaningfully in the debate over" legislation pending in Congress); *EFF I,* 2007

8  WL 4208311, at *7 (irreparable harm where records would allow "plaintiff, Congress, and

9  the public [to] participate in the debate over the pending legislation on an informed

10  basis").

11         2.       Moreover, Plaintiffs will suffer irreparable harm even in the absence of any

12  specific scheduled execution.  The Constitution jealously safeguards the "uninhibited,

13  robust, and wide-open" "debate on public issues" necessary to secure an informed

14  citizenry.  *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964); *see also EFF II*, 542

15  F.Supp.2d at 1187.  Few public debates are of greater societal significance than the debate

16  about the death penalty.  "An informed public debate is critical in determining whether

17  execution by lethal injection comports with 'the evolving standards of decency which

18  mark the progress of a maturing society.'"  *California First Amendment Coal. v.*

19  *Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) (citation omitted).

20         The information sought here pertains to the quality and origin of sodium

21  thiopental acquired by states that execute inmates through lethal injection, and thus sheds

22  light on the extent to which inmates feel pain during an execution, an issue of great legal

23  import.  *See Morales*, 465 F.Supp.2d at 975.  The information sought here also reveals

24  details about the extent to which states endeavored, or failed, to comply with federal laws

25  in acquiring sodium thiopental for executions, as well as the extent to which the federal

26  government properly executed its responsibility in regulating controlled substances.

27  Whether the state and federal governments were as scrupulous in their compliance with

28  federal drug laws in matters involving lethal injection as in other contexts, bears on the

18

1   overall integrity of government in implementing the death penalty and in regulating the

2   importation of controlled substances which may find their way into medical use or the

3   stream of commerce, once in the country.  The information sought here is undeniably

4   critical to the public debate.  *See id.* at 973 ("Few issues in American society have

5   generated as much impassioned debate as the death penalty.").

6        "[A]bsent a preliminary injunction," Plaintiffs will "los[e] [their] right to expedited

7   processing … [and to] obtain[] in a timely fashion information vital to the current and

8   ongoing debate surrounding" the death penalty.  *EPIC*, 416 F.Supp.2d at 41 (irreparable

9   harm from deprivation of timely information vital to current and ongoing debate over

10  warrantless surveillance program); *cf. also, e.g., Sammartano v. First Judicial District*

11  *Court*, 303 F.3d 959, 973-74 (9th Cir. 2002) (curtailment of the right to speak on a matter

12  of public concern "'for even minimal periods of time, unquestionably constitutes

13  irreparable injury' for purposes of the issuance of a preliminary injunction") (citation

14  omitted).  That debate "cannot be restarted or wound back."  *Gerstein,* 2006 WL 3462569,

15  at *4 (irreparable harm from deprivation of timely information vital to ongoing debate

16  about leaks of classified information).

17       **C.    THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFFS' FAVOR**

18       The balance of hardships tips sharply in Plaintiffs' favor because absent a

19  preliminary injunction, Plaintiffs will suffer irreparable harm, and expedited processing of

20  even the most time-sensitive portions of Plaintiffs' request will not pose any unique

21  burden on Defendant.

22       The immediate relief sought requires nothing more than what federal law already

23  mandates and DEA agrees is appropriate here:  the expedited processing of Plaintiffs'

24  FOIA requests.  Under these circumstances, courts of this district have agreed that this

25  factor weighs in favor of a preliminary injunction.  *See, e.g., EFF I,* 2007 WL 4208311, at

26  *7 (no undue burden on agency where plaintiffs' entitlement to expedited processing

27  conceded and compliance would require nothing more than readjustment of internal

28  priorities).

19

1       Further, statistics on DEA's FOIA caseload confirm that a preliminary injunction

2 would not be burdensome.  DEA routinely completes processing of expedited FOIA

3 requests in less than the time at issue here.  In the 2010 Fiscal Year, DEA granted

4 expedited processing to 21 FOIA requests; it completed 19 within 100 days.  *See* Minsker

5 Decl. at ¶30 & Exh. 15.  In the 2009 Fiscal Year, DEA had granted expedited processing

6 to only two requests, one of which it processed in under 20 days.  A preliminary

7 injunction in this matter would give DEA more than 100 days to process Plaintiffs'

8 request, as 100 days had passed at the time the Complaint was filed.

9       **D.**      **THE PUBLIC INTEREST FAVORS THE REQUESTED RELIEF**

10       Finally, the public interest weighs in favor of the preliminary injunction.  "[T]he

11 public interest is … served by the expedited release of the requested documents because it

12 furthers FOIA's core purpose of 'shed[ding] light on an agency's performance of its

13 statutory duties.'"  *EPIC,* 416 F.Supp.2d at 42 (quoting *Dep't of Justice v. Reporters'*

14 *Comm. for Freedom of the Press,* 489 U.S. 749, 773 (1989)); *accord EFF I,* 2007 WL

15 4208311, at *7; *Gerstein*, 2006 WL 3462659, at *5.  Indeed, "[b]y granting [Plaintiffs']

16 request for expedited processing, defendants have effectively conceded that [Plaintiffs

17 have] demonstrated an 'urgency to inform the public' about the government activity that is

18 the subject of [their] requests."  *Gerstein*, 2006 WL 3462659, at *5 (quoting 5 U.S.C.

19 §552(a)(6)(E)(v)(II)).  Moreover, "there is an overriding public interest . . . in the general

20 importance of an agency's faithful adherence to its statutory mandate."  *Jacksonville Port*

21 *Auth. v. Adams,* 556 F.2d 52, 59 (D.C. Cir. 1977).[7]

22       ///

23       ///

---

24 [7] No bond is necessary in this case for three separate and independent reasons.  First,
Plaintiffs have a strong likelihood of success on the merits.  *See Scherr v. Volpe,* 466 F.2d

25 1027, 1035 (7th Cir. 1972).  Second, there is no realistic likelihood of harm to Defendant
resulting from issuance of the injunction.  *See Jorgensen v. Cassiday*, 320 F.3d 906, 919

26 (9th Cir. 1997).  Third, the "equities of potential hardships to the parties" weighs in favor
of Plaintiffs.  *Temple Univ. v. White,* 941 F.2d 201, 220 (3d Cir. 1991).  Finally, because

27 the preliminary injunction merely requires compliance with DEA's statutory FOIA
obligations, a bond is conceptually inapplicable since there is no risk of monetary loss.

28

V.      CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.   Defendant should be ordered to produce all records that bear on the imminent Arizona execution no later than May 16, 2011,[8] the week before the execution in that state is scheduled to occur, and the remaining records by June 7, 2011, one week before the execution in Nebraska is scheduled to occur.  Defendant should also be ordered to produce no later than June 7, 2011, an affidavit attesting to compliance and setting forth a basis for withholding any responsive documents.


Dated: April 28, 2011                              Respectfully submitted,


                                                   By:_____/s/_____
                                                                Linda Lye

                                                   Michael T. Risher
                                                   Linda Lye
                                                   AMERICAN CIVIL LIBERTIES UNION
                                                   FOUNDATION OF NORTHERN
                                                   CALIFORNIA
                                                   39 Drumm Street
                                                   San Francisco, CA 94111
                                                   Tel: (415) 621-2493
                                                   Fax: (415) 255-8437

                                                   Attorneys for Plaintiffs

---

[8] This includes (a) all records explicitly referencing Arizona, (b) all records pertaining to Dream Pharma (the United Kingdom distributor from which Arizona obtained its sodium thiopental), including records relating to DEA's seizure of sodium thiopental from other states, such as Georgia, Kentucky, Tennessee, and South Carolina, that had been obtained from Dream Pharma; and (c) all records relating to any DEA policy or lack of policy regarding the importation of controlled substances to be used in executions.

CASE NO. C 11-01997 RS
MOT. FOR PI; MEM. OF P&AS ISO MOT. FOR PI

# Appendix



## Supreme Court

**STATE OF ARIZONA**

RACHELLE M. RESNICK
CLERK OF THE COURT

402 ARIZONA STATE COURTS BUILDING
1501 WEST WASHINGTON STREET
PHOENIX, ARIZONA 85007-3231

TELEPHONE: (602) 452-3396

SUZANNE D. BUNNIN
CHIEF DEPUTY CLERK

November 30, 2010

RE:   STATE OF ARIZONA v DANIEL WAYNE COOK
      Arizona Supreme Court   No. CR-88-0301-AP
      Mohave County Superior Court   No. CR-9358

GREETINGS:

The following action was taken by the Supreme Court of the State of
Arizona on November 30, 2010, in regard to the above-referenced
cause:

**ORDERED: The State of Arizona's Motion for Warrant of Execution =
CONTINUED.  The State shall file a response to the supplemental
memoranda filed by Defendant not later than December 30, 2010.**

Rachelle M. Resnick, Clerk

TO:
Kent E Cattani, Chief Counsel, Capital Litigation Section, Arizona
   Attorney General's Office
Michael J Meehan, Munger Chadwick
Jon M Sands, Federal Public Defender's Office, Phoenix Office
Dale A Baich, Federal Public Defender's Office, Phoenix Office
Daniel Wayne Cook, ADOC #69007, Arizona State Prison, Florence –
   Eyman Complex-Browning Unit (SMU II)
Diane Alessi
Amy Sara Armstrong

lo