Michael T. Risher (CA SBN 191627)
mrisher@aclunc.org
Linda Lye (CA SBN 215584)
llye@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm St., 2nd Floor
San Francisco, California 94111
Telephone:   415-621-2493
Facsimile:   415-255-8437

Richard M. Pearl (CA SBN 46351)
rpearl@interx.net
LAW OFFICES OF RICHARD M. PEARL
1816 Fifth Street
Berkeley, CA 94710
Telephone:  510-649-0810
Facsimile:  510-548-5074

Attorneys for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA and
SAN FRANCISCO BAY GUARDIAN

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA; SAN FRANCISCO BAY GUARDIAN, <br><br> Plaintiffs, <br><br> v. <br><br> DRUG ENFORCEMENT ADMINISTRATION, <br><br> Defendant. | CASE NO.: C 11-01997 RS <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR REASONABLE ATTORNEYS' FEES AND LITIGATION COSTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Hearing Date: July 12, 2012 <br><br> Time: 1:30 pm <br><br> Dept.: Courtroom 3, 17th Floor |

1
2

**NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND**

**LITIGATION COSTS**

3    TO DEFENDANT AND ITS COUNSEL OF RECORD:  PLEASE TAKE NOTICE

4    THAT on July 12, 2012 at 1:30 pm, or as soon thereafter as the parties may be heard,

5    Plaintiffs American Civil Liberties Union of Northern California and San Francisco Bay

6    Guardian will bring for hearing a motion for reasonable attorneys' fees and costs.  The

7    hearing will take place before the Honorable Richard Seeborg, in Courtroom 3, 17th

8    Floor, 450 Golden Gate Avenue, San Francisco, CA 94102.  This motion is based on this

9    notice, the attached memorandum of points and authorities, the accompanying

10   Declarations of Linda Lye, Richard M. Pearl, Natasha Minsker, and Michael Rubin, and

11   attached exhibits, all pleadings, papers and filed in this action, and such oral argument and

12   evidence as may be presented at the hearing on the motion.

13
14   Dated:   May 10, 2012                              Respectfully submitted,

15                                                      By: _____/s/_____
16                                                              Richard M. Pearl

17                                                      Richard M. Pearl
                                                        LAW OFFICES OF RICHARD M. PEARL
18
                                                        Michael T. Risher
19                                                      Linda Lye
                                                        AMERICAN CIVIL LIBERTIES UNION
20                                                      FOUNDATION OF NORTHERN
                                                        CALIFORNIA
21
                                                        Attorneys for Plaintiffs
22
23
24
25
26
27
28

**CASE NO. C 11-01997 RS**
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION  ......................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

    A.    Role of Sodium Thiopental in Executions by Lethal Injection ........................ 2

    B.    DEA's Role In Overseeing Importation of Sodium Thiopental ....................... 2

    C.    State Response to Domestic Shortage of Thiopental ....................................... 2

    D.    Plaintiffs' Seek Information About Federal Role in Overseeing
           Importation ...................................................................................................... 3

    E.    Plaintiffs' Counsel ........................................................................................... 4

    F.    Plaintiffs File Suit to Obtain Records Before Two Scheduled
           Executions ....................................................................................................... 5

    G.    DEA Responds to the Lawsuit and Preliminary Injunction Motion by
           Producing Documents ...................................................................................... 6

    H.    Plaintiffs' Pursuit of DEA Form 236 Import Declarations .............................. 6

    I.    Impact of Disclosure of Documents Obtained by Plaintiffs ............................ 8

    J.    DEA Produces More Documents After Losing Key Issues on
           Summary Judgment ....................................................................................... 11

    K.    Significance of Documents Disclosed Pursuant to Court Order .................... 12

    L.    The Lawsuit is Dismissed and the Parties Meet and Confer on Fees ............. 13

III. ARGUMENT  ............................................................................................... 14

    A.    PLAINTIFFS ARE ELIGIBLE AND ENTITLED TO AN AWARD
           OF REASONABLE ATTORNEYS' FEES AND LITIGATION
           COSTS  ......................................................................................................... 14

           1.    Having Substantially Prevailed, Plaintiffs Are Eligible for a Fee
                Award .................................................................................................. 14

           2.    Plaintiffs Are Entitled to a Fee Award ................................................. 15

i

B.   PLAINTIFFS' ATTORNEYS' FEES ARE REASONABLE ...................... 19

1.   A Summary of Plaintiffs' Claim. ......................................................... 19

2.   Plaintiffs' Lodestar Is Reasonable ...................................................... 20

a.   Counsel's Hourly Rates Are Reasonable. .................................... 20

b.   The Number of Hours Claimed Is Reasonable ............................. 21

(1) Plaintiffs' hours are fully-documented and modest for a case of this novelty and importance .............................................. 22

(2) Plaintiffs are entitled to a fully compensatory fee .................. 23

IV.   CONCLUSION ...................................................................................... 25

**CASE NO. C 11-01997 RS**
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**CASES**

*Assembly of the State of California v. Dept. of Commerce*, 1993 WL
188328 (E.D.Cal. 1993) .................................................................................... 24

*Balla v. State of Idaho*, __F.3d __, 2012 WL 1293410 (9th Cir. 2012)............... 22, 24, 25

*Blum v. Stenson,* 465 U.S. 886 (1984)........................................................... 20, 21

*Brewer v. Landrigan*, _U.S._, 131 S.Ct. 445 (2010) ............................................. 3

*California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir.
2002).............................................................................................................. 1, 17

*Citizens Comm'n on Human Rights v. FDA,*45 F.3d 1325 (9th Cir. 1995)..................... 18

*Coordinated Pretrial Proceeding v. Exxon Corp.*, 109 F.3d 602 (9th Cir.
1997).................................................................................................................. 22

*Cuneo v. Rumsfeld,* 553 F.2d 1360 (D.C. Cir. 1977) ...................................... 16

*Dang v. Cross,* 422 F.3d 800, 813 (9th Cir. 2005) ........................................... 23

*Davis v. City & County of San Francisco,* 976 F.2d 1536 (9th Cir. 1992) ...................... 20

*Davy v. CIA,* 550 F.3d 1155 (D.C. Cir. 2008)......................................... 17, 18

*Deininger & Wingfield, P.A. v. I.R.S.,* 2009 WL 2241569 (E.D. Ark. 2009) .................. 18

*Elec. Priv. Info. Ctr. v. U.S. Dept. of Homeland Sec.*, 811 F.Supp.2d 216
(D.D.C. 2011).......................................................................................... 16, 17, 18

*Fenster v. Brown,* 617 F.2d 740 (D.C. Cir. 1979)........................................... 16

*Gates v.  Deukmejian*, 987 F.2d 1392 (9th Cir. 1993) ................................. 19, 22

*Guam Soc. of Obstetricians and Gynecologists v. Ada,* 100 F.3d 691 (9th
Cir. 1996)......................................................................................................... 23

*Hensley v. Eckerhart*, 461 U.S. 424 (1983)........................................... 19, 22, 23

*Judicial Watch, Inc. v. U.S. Dept. of Justice*, 774 F.Supp.2d 225 (D.D.C.
2011)................................................................................................................ 16

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir. 1975) ........................................ 19

*Kuzma v. IRS,* 821 F.2d 930 (2d Cir. 1987) ............................................................ 19

*Landrigan v. Brewer,* 2010 WL 4269559 (D. Ariz. Oct. 25, 2010) .................................... 3

*Long v. IRS,* 932 F.2d 1309 (9th Cir. 1991) ............................................................ 14

*Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830 (9th Cir. 1982) .................................... 25

*Morales v. Cate,* 2010 WL 3835655 (Sept. 28, 2010) ........................................... 3

*Morales v. Tilton,* 465 F.Supp.2d 972 (N.D. Cal. 2006) ...................................... 2, 16, 17

*Moreno v. City of Sacramento,* 534 F.3d 1106 (9th Cir. 2008) ................................... 23, 25

*Oregon Natural Desert Assn. v. Locke,* 572 F.3d 610 (9th Cir. 2009) ............................. 14

*Perkins v. Mobile Housing Board,* 847 F.2d 735 (11th Cir. 1988) .................................. 22

*Playboy Enter. v. U.S. Customs Serv.,* 959 F.Supp.11 (D.D.C. 1997) ....................... 16, 17

*Prison Legal News v. Schwarzenegger,* 608 F.3d 446 (9th Cir. 2010) .......................... 20

*Read v. FAA,* 252 F.Supp.2d 1108 (W.D. Wash. 2003) ................................................ 20

*Save Our Cumberland Mtns., Inc. v. Hodel,* 857 F.2d 1516 (D.C. Cir. 1988) ........................................................................................................ 19

*Sorenson v. Mink,* 239 F.3d 1140 (9th Cir. 2001) ................................................... 23

*U.S. v. City & County of San Francisco,* 748 F.Supp. 1416 (N.D.Cal. 1990) ........................................................................................................ 20

*United States v. Rx Depot, Inc.,* 290 F.Supp.2d 1238 (N.D. Okla. 2003) ................. 2, 16


**STATUTES**

15 Cal. Code Regs. §3349 ........................................................................................ 2

21 C.F.R. §1312 ..................................................................................................... 2, 7

21 U.S.C. §812(b)(3) ............................................................................................... 2

CASE NO. C 11-01997 RS
Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support

21 U.S.C. §952 ................................................................................... 2

28 C.F.R. § 0.100 ............................................................................... 2

5 U.S.C. §552 ........................................................................... 4, 14, 19


**OTHER AUTHORITIES**

153 Cong. Rec. S15701-04 (daily ed. Dec. 14, 2007) .................................. 14

Ariande de Vogue, "DOJ Tells Arizona it Illegally Obtained Death
   Penalty Drug," *ABC News,* May 25, 2011 ......................................... 10

Associated Press, "High Court stops Scheduled Execution for Arizona
   Inmate," May 25, 2011 ................................................................. 10

David Schwartz, "Arizona Supreme Court stays execution," Reuters, May
   25, 2011 ................................................................................... 10

Greg Bluestein, "Emails Show States Didn't Register Execution Drug,"
   *Associated Press*, May 19, 2011 ..................................................... 9

John Schwartz, "Seeking Execution Drug, States Cut Legal Corners," *New
   York Times*, Apr. 13, 2011 ............................................................. 4

Ofc. of Legal Counsel, 6 U.S. Op. Off. Legal Counsel 577, 1982 WL
   170725 (1982) ............................................................................ 2

Ryan Gabrielson, "White House Watched as state scrambled for lethal
   drug," *California Watch*, May 23, 2011 ............................................. 9

S. REP. NO. 93–854 (1974) .................................................................. 18

The Informant, "Execution Drugs: Who has what?" KALW News, May
   19, 2011 ................................................................................... 9

Tim Redmond, "DEA investigates illegal import of death drugs," *San
   Francisco Bay Guardian,* May 19, 2011 ............................................ 9

1

## I.  INTRODUCTION

2        Plaintiffs are a non-profit civil rights organization and an independent newspaper.

3   In this action, they sought and obtained records pursuant to the Freedom of Information

4   Act (FOIA), 5 U.S.C. §552, exposing the fact that numerous states, in their haste to

5   execute inmates by lethal injection, had violated the federal Controlled Substances Act by

6   unlawfully procuring foreign drugs that lacked an assurance of safety or efficacy.

7   Documents obtained by Plaintiffs also exposed the fact that Defendant Drug Enforcement

8   Agency (DEA), the federal agency charged with enforcing our nation's drug laws, sat on

9   its hands and failed to act on information long in its possession about unlawful state

10  conduct in the context of the death penalty, and then acted to enforce the law evenly, only

11  after Plaintiffs obtained documents in this action.  The documents at issue here received

12  widespread media coverage and contributed to the "informed public debate [that] is

13  critical in determining whether execution by lethal injection comports with the evolving

14  standards of decency which mark the progress of a maturing society." *California First*

15  *Amendment Coalition v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) (citation omitted).

16        As the prevailing parties, Plaintiffs are now entitled to their reasonable attorneys'

17  fees and litigation costs under FOIA, 5 U.S.C. §552(a)(4)(E), which authorizes fees and

18  costs when documents are obtained by court order or under a catalyst theory. Plaintiffs'

19  lodestar for work on the merits, consisting of work on a preliminary injunction motion and

20  cross-motions for summary judgment, is $119,573, plus litigation costs of $386.61.

21  Plaintiffs also request fees for this motion.  The lodestar for work on this motion to date is

22  $31,485, to be supplemented for additional work on reply.

23        In this Memorandum, Plaintiffs will briefly recount the history of this litigation to

24  put their fee claim in context.  Plaintiffs then will show that, having substantially prevailed

25  and litigated solely for the public benefit, they are eligible for and entitled to an award of

26  fees under FOIA.  Next, Plaintiffs will show that the attorneys' fees they request are

27  reasonable. Their hourly rates are well in line with the prevailing market rates for similarly

28

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1  complex federal litigation.  The number of hours for which compensation is requested is

2  fully documented and reflects the careful exercise of billing judgment, counsel's

3  efficiency, and the difficult burdens and novel issues they faced in this action. Both the

4  level of success Plaintiffs achieved in this important litigation and the congressional

5  purposes that underlie FOIA strongly support a fully compensatory fee.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

6

7  **A.**      **Role of Sodium Thiopental in Executions by Lethal Injection**

8             Approximately 30 states, including California, use sodium thiopental as part of a

9  three-drug lethal injection protocol.  *See, e.g.,* 15 Cal. Code Regs. §§3349.1.1(q),

10  3349.4.5(g)(5)(A), (B); Minsker Decl. at ¶3.  Thiopental is intended to anesthetize the

11  inmate from experiencing what would otherwise be excruciating, potentially

12  unconstitutional pain.  *Morales v. Tilton*, 465 F.Supp.2d 972, 975 (N.D. Cal. 2006).  As a

13  result, its efficacy bears directly on the legality of executions.  But foreign drugs "do not

14  have the same assurance of safety and efficacy" as domestic drugs.  *United States v. Rx*

15  *Depot, Inc*., 290 F.Supp.2d 1238, 1241-42 (N.D. Okla. 2003).

16  **B.**      **DEA's Role In Overseeing Importation of Sodium Thiopental**

17             Thiopental is a Schedule III controlled substance.  *See* 21 U.S.C. §812(b)(3).  It is

18  unlawful for any person to "import or cause to be imported" sodium thiopental unless that

19  person is registered (or exempt from registration) and has filed a detailed import

20  declaration (DEA Form 236).  *See* 21 C.F.R. §§1312.11(b), 1312.18(b).  This prohibition

21  applies when government agencies imports drugs.  Ofc. of Legal Counsel, 6 U.S. Op. Off.

22  Legal Counsel 577, 1982 WL 170725 (1982).  Unlawful importation is a criminal offense.

23  *See* 21 U.S.C. §952.  DEA is charged with enforcing these laws.  *See* 28 C.F.R. § 0.100.

24  **C.**      **State Response to Domestic Shortage of Thiopental**

25             In May 2010, the media began reporting that thiopental was no longer available

26  due to production problems with its only domestic manufacturer.  The shortage impacted

27  executions.  Minsker Decl. at ¶¶4-5.  California, for example, hastily attempted to

28

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

schedule an execution for September 30, 2010, prior to the impending October 1, 2010 expiration of its scarce remaining drug supply, but the execution was halted by a federal court.  *See id.* at ¶5; *Morales v. Cate,* 2010 WL 3835655 (Sept. 28, 2010).

States turned overseas to acquire the drug.  Eventually it came to light that at least ten states obtained imported thiopental.  Two (Nebraska and South Dakota) obtained it from India-based Kayem Pharmaceutical, whose owner publicly stated his company is not licensed to import controlled substances.  Eight (Alabama, Arizona, Arkansas, California, Georgia, Kentucky, South Carolina, and Tennessee) obtained imported supplies originating with United Kingdom distributor Dream Pharma.  *See* Minsker Decl. at ¶¶6-8.

The importation generated legal challenges and extensive media attention.  *See id.* at ¶¶9-10.  On October 25, 2010, a federal district court issued a TRO enjoining an Arizona execution based on uncertainties about the drug's origin and efficacy.  *See Landrigan v. Brewer,* 2010 WL 4269559 (D. Ariz. Oct. 25, 2010).  The court noted that while Arizona insisted that "the drug was 'lawfully' obtained," "[i]t is unclear …whether Defendants complied with "procedures … for the importation of [Schedule III controlled] substances into the United States" because Arizona refused to disclose "[t]he precise method in which [it had] obtained the sodium thiopental at issue."  *Id.* at *4 & n.4.[1]

**D.  Plaintiffs' Seek Information About Federal Role in Overseeing Importation**

On January 4, 2011, Plaintiffs submitted a FOIA request to DEA seeking records related to state efforts to import, transfer, or purchase sodium thiopental or the other drugs commonly used in lethal injection.  *See* Minsker Decl. at ¶11 & Exh. 1.  Plaintiffs sought expedited processing and supported the request with 139 news articles to demonstrate the extraordinary newsworthiness of the subject.  *See id.*  Agreeing that the subject was a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," DEA granted Plaintiffs' request for expedited processing on January 18, 2011.  *Id.* at ¶12 & Exh. 2.

---

[1] The next day, the Supreme Court voted 5-4 to vacate the TRO.  *See Brewer v. Landrigan*, _U.S._, 131 S.Ct. 445 (2010).

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1    Meanwhile, questions continued to arise whether state corrections officials had

2    violated federal law in importing the drug and why federal agencies such as DEA

3    appeared to have done nothing to enforce those laws.  *See, e.g.,* John Schwartz, "Seeking

4    Execution Drug, States Cut Legal Corners," *New York Times*, Apr. 13, 2011, attached as

5    Minsker Decl., Exh. 4.  By the middle of April 2011, and in the midst of this growing

6    controversy, DEA eventually seized sodium thiopental intended for use in executions from

7    four states that had obtained their supply from UK distributor Dream Pharma:  Georgia,

8    Kentucky, Tennessee, and South Carolina.  *See* Minsker Decl. at ¶19.  But at that juncture,

9    there were several other states that had also imported sodium thiopental from abroad and

10   DEA had done nothing to seize their supply or explain its failure to do so.  *See id.* at ¶20.

11   Despite DEA's grant of expedited processing, over 100 days passed from the time

12   of Plaintiffs' January 4, 2011 FOIA request without the production of any documents, or

13   even an initial determination by DEA whether it would comply, despite its statutory

14   obligation to do so within 20 working days.  *See id.* at ¶¶13-17; 5 U.S.C. §552(a)(6)(A)(i).

15   The delay became intolerable when two states that had imported the drug – but as

16   to which DEA had not taken enforcement action – set execution dates:  On April 19, 2011,

17   Arizona – which obtained the drug from the same UK Distributor as other states from

18   which DEA had made seizures – set an execution date for May 25, 2011.  On April 21,

19   2011, Nebraska, which had obtained its drug from Kayem Pharmaceuticals, an Indian

20   company that was not licensed by DEA to import controlled substances into this country,

21   set an execution for June 14, 2011.  *See* Minsker Decl. at ¶¶21-22.

22   **E.    Plaintiffs' Counsel**

23   From the inception of this controversy, Plaintiffs have been represented by two

24   highly-qualified attorneys from the American Civil Liberties Union Foundation of

25   Northern California. Lead counsel was ACLU staff attorney Linda Lye, a 12-year attorney

26   with extensive experience as a law clerk in the federal appellate courts, as an associate and

27   partner with San Francisco's Altshuler Berzon LLP, and with the American Civil Liberties

28   Union Foundation of Northern California.  Lye Decl. at  ¶24.  Her co-counsel has been

4

1  Michael Risher, a 15-year attorney with similar credentials and extensive trial experience,

2  having tried more than twenty cases to verdict.  *Id.* at ¶25.

3  **F.      Plaintiffs File Suit to Obtain Records *Before* Two Scheduled Executions**

4          Plaintiffs took urgently needed steps to obtain records responsive to their FOIA

5  request – records that would shed light on the legality of states' efforts to import sodium

6  thiopental and the DEA's role in enforcing, or *not* enforcing, federal drug law in the

7  context of the death penalty – prior to the two scheduled executions.

8          As soon as Plaintiffs learned of the scheduled executions in Arizona and Nebraska,

9  they filed suit and served the complaint in this action, on April 22, 2011.  *See* Doc. 1; Lye

10 Decl. at ¶¶3-4.  That same day, counsel for Plaintiffs contacted the United States

11 Attorney's Office, counsel for Defendant, to alert it to the lawsuit, explain that the

12 requests were highly time-sensitive given impending executions in Arizona and Nebraska,

13 and propose that the parties negotiate a document production schedule.  Lye Decl. at ¶5.

14 Plaintiffs sought Arizona related documents by May 16, 2011, and the remaining

15 documents by June 7, 2011, *i.e.*, one week in advance of each execution.  *See id.* at ¶7.

16         Over the next three business days, on April 25, 26, and 27, 2011, Plaintiffs

17 attempted to negotiate with DEA a schedule for processing the records.  DEA's position,

18 however, was that it would only commit to producing some of the records in advance of

19 the Arizona and Nebraska executions, but that it would not commit to complete the

20 production by a date certain.  In particular, DEA indicated that certain documents were

21 authored by another agency and that it would need to consult with those agencies before

22 producing them.  Counsel for DEA represented that as of April 27, 2011, DEA had

23 already sent out all requests for consultation to other agencies.   Lye Decl. at ¶¶8-12.

24         Because DEA would not agree to complete processing by a date certain in advance

25 of the Arizona and Nebraska executions, Plaintiffs on April 28, 2011 filed a preliminary

26 injunction motion and an application to shorten time.  *See id.* at ¶13; Docs. 8-14.

27         / / /

28         / / /

5

### G.    DEA Responds to the Lawsuit and Preliminary Injunction Motion by Producing Documents

Plaintiffs obtained critical documents from DEA in May 2011.  The record shows DEA would not have initiated key searches or produced documents before the Arizona execution absent Plaintiffs' pursuit of this lawsuit and a preliminary injunction motion:

- ***Initiating key search***.  Five days after Plaintiffs initiated this action, on April 27, 2011, DEA initiated a search for responsive records at DEA Headquarters and in some field divisions.  *See* Myrick Decl. (Doc. 20-1) at ¶6.  This was the first search it had conducted of its field divisions.[2]  DEA admits its April 27, 2011 search was "prompted" by and conducted "[i]n response to" Plaintiffs' lawsuit.  See Myrick Decl. (Doc. 25-2) at ¶5 ("*In response to the suit*, the DEA conducted a standard litigation review of the FOIA administrative file, which prompted a supplemental search for responsive records.") (emphasis added).

- ***Sending out requests for consultation to other agencies***.  Although DEA had previously indicated that it had sent out requests for consultation to other agencies (a prerequisite to producing documents) as of April 27, 2011, Lye Decl. at ¶12, the record demonstrates that it failed to send out the requests until May 2, 2011, four days *after* Plaintiffs filed their preliminary injunction motion on April 28, 2011.  *See* Myrick Decl. (Doc. 20-1), Exh. E.  The consultation letters on their face show that they were sent out only after and because Plaintiffs had filed the motion.  Each letter stated: "This matter is urgent in terms of time sensitivity *as the ACLU has sought a preliminary injunction* for records against the DEA.  *As such*, we are asking that your response be provided to this office no later than May 06, 2011."  *See id.* (emphasis added).

- ***Producing first set of documents***.  DEA produced a first set of documents by letter dated May 4, 2012, consisting of 27 pages.  *See* Minsker Decl. at ¶24  DEA produced these documents after this Court on May 3, 2011 granted Plaintiffs' application to shorten time on the preliminary injunction motion (*see* Doc. 19), and two days before DEA filed its opposition brief, allowing DEA to emphasize in its brief that it had already produced some and would produce more documents, and to argue that the motion was moot.  *See* Doc. 20 at 1, 4.

- ***Committing to production of further documents by date certain***.  Although DEA had, prior to Plaintiffs' filing of the motion, indicated that it could not commit to a date certain for production, Lye Decl. ¶¶10-11, DEA in its opposition to Plaintiffs' preliminary injunction motion committed for the first time to producing records by a date certain (May 16, 2011) in advance of the Arizona execution.  *See* Doc. 20 at 2:12; Lye Decl. at ¶14.

### H.    Plaintiffs' Pursuit of DEA Form 236 Import Declarations

Even though DEA produced some documents on May 4, 2012 and agreed to produce more on May 16, 2011, Plaintiffs had no choice but to press the preliminary

---

[2] DEA had apparently completed an initial search for records at DEA Headquarters (but not field divisions) on February 8, 2011, *see* Myrick Decl. (Doc. 20-1) at ¶5, but had not produced any records to Plaintiffs prior to the filing of this lawsuit.

6

1  injunction motion because of concerns that DEA had failed to produce numerous

2  categories of documents that Plaintiffs had reason to believe existed.  Most troubling was

3  that DEA's production failed to include a single Form 236 import declaration, a category

4  of documents identified in Plaintiffs' FOIA request and required to be filed in

5  quintuplicate whenever controlled substances are imported.  *See* Doc. 21 at 13-14 of 27;

6  21 C.F.R §§1312.11(b), 1312.18(b), (c).  The import declarations were crucial because

7  they would illuminate whether states importing sodium thiopental complied with the

8  federal Controlled Substances Act, which requires such declarations to be filed.  *See* 21

9  C.F.R. §§1312.11(b), 1312.18(b).  In light of the impending Arizona and Nebraska

10  executions, Plaintiffs sought to determine whether these two states in particular had filed

11  Form 236 import declarations.  *See* Minsker Decl. at ¶26.  On reply, Plaintiffs thus

12  explained why they believed that DEA's cursory search had been inadequate.  *See* Doc. 21

13  at 13-16 of 27.

14        At the preliminary injunction hearing, on May 12, 2011, the Court ordered the

15  parties to file a Joint Status Report after DEA's intended May 16, 2011 production.  *See*

16  Doc. 24.  On May 16, 2011, DEA produced 90 documents.  *See* Minsker Decl. at ¶28.

17        As instructed by the Court, the parties filed a Joint Status Report on May 18, 2011.

18  Plaintiffs continued to express grave concerns about the adequacy of the search because

19  DEA had not searched numerous offices that were likely to contain responsive records and

20  because the search it had conducted was inadequate.  *See* Doc. 25 at 3-7 of 11.  Plaintiffs

21  emphasized, among other things, the continued and significant omission of any Form 236

22  import declarations from DEA's production, despite the fact that documents produced by

23  DEA on May 16, 2011 confirmed the existence of at least two such import declarations.

24  *See* Doc. 25 at 5-6 of 11; Minsker Decl. ¶32, Exh. 5 at Bates 3.

25        In the Joint Status Report, DEA did not dispute the existence of the two Form 236

26  import declarations, but contended that they were not responsive to Plaintiffs' request by

27

28

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

narrowly construing the request.  *See* Doc. 25 at 9 of 11.[3]  DEA was unmoved by

Plaintiffs' emphasis of the agency's duty to construe a FOIA request liberally and

explanation that their FOIA request sought Form 236s pertaining to state efforts to import

the drug, regardless of whether an intermediary assisted in that effort.  *See* Doc. 25 at 6 of

11.  DEA stated:  "If Plaintiffs are now seeking records regarding private companies…,

they may supplement their current FOIA request for those records."  *Id.*

　　　　　Plaintiffs took up the invitation and wrote to DEA on May 20, 2011, again

emphasizing its duty to construe a FOIA request liberally and reiterating that Plaintiffs'

FOIA request sought all Form 236's pertaining to lethal injection, even if the Form had

been filed by a private entity on behalf a state rather than directly by a state.  *See* Minsker

Decl. ¶36 & Exh. 7.  Plaintiffs urged DEA to produce the records promptly in light of the

impending May 25, 2011 execution in Arizona.  *Id.*

　　　　　On May 23, 2011, this Court denied the preliminary injunction motion on the

ground that the search DEA had conducted was, at that stage, sufficient.  *See* Doc. 26.

　　　　　That same day, DEA produced four DEA Form 236s, in response to Plaintiffs'

request for all Form 236s relating to the importation of sodium thiopental since January 1,

2010.  *See* Minsker Decl. ¶38 & Exh. 8.  None of the import declarations produced to

Plaintiffs involved the state of Arizona, finally proving that Arizona had imported its

supply of the drug in violation of the Controlled Substances Act.  *See id.* at ¶ 39.

## I.     Impact of Disclosure of Documents Obtained by Plaintiffs

　　　　　Plaintiffs obtained documents showing that only a handful of states had filed

import declarations, proving that the remainder that had imported the drug had done so

illegally.  *See* Minsker Decl. at ¶¶32-33, 38-39 & Exh. 5 at Bates 3.

---

[3] Plaintiffs' FOIA request sought records "pertaining to the acquisition of controlled substances by state officials … for the purpose of carrying out executions of condemned prisoners by lethal injection," and specifically requested: "[r]ecords created since January 1, 2010 regarding any actual importation of sodium thiopental…by state officials for the purpose of execution, including but not limited to: …DEA form 236."  *See* Minsker Decl., Exh. 1 (January 4, 2011 FOIA Request) at pages 1 and 3 (request number 9).  DEA construed this request to exclude Form 236s filed by private parties on behalf of state officials. *See* Doc. 25 at 9 of 11.

8

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1    ***Media coverage***.  Plaintiffs' lawsuit and the documents obtained in May 2011

2    generated significant media interest.  *See, e.g.,* Ryan Gabrielson, "White House Watched

3    as state scrambled for lethal drug," *California Watch*, May 23, 2011 ("Records released to

4    the ACLU have served as the primary source of information about states' frantic

5    international search for sodium thiopental as domestic supplies of the drug expired or ran

6    out."); Greg Bluestein, "Emails Show States Didn't Register Execution Drug," *Associated*

7    *Press*, May 19, 2011 ("The emails were obtained … by the ACLU of Northern

8    California"); Tim Redmond, "DEA investigates illegal import of death drugs," *San*

9    *Francisco Bay Guardian,* May 19, 2011 ("The documents are the latest released as a result

10   of a federal lawsuit filed by the ACLU of Northern California and the Bay Guardian");

11   The Informant, "Execution Drugs: Who has what?" KALW News, May 19, 2011 (lawsuit

12   seeks to address "why the DEA has seized drugs from half the states that imported them,

13   while leaving the other half untouched") (all attached as Minsker Decl., Exh. 6).

14   ***Effect on DEA enforcement***.  Plaintiffs' lawsuit and the documents obtained,

15   especially, the Form 236s, also prompted DEA, finally, to enforce federal drug laws

16   evenly as to all states that had illegally procured foreign drugs.

17   On May 24, 2011, the day after DEA released to Plaintiffs the Form 236s and the

18   day before the scheduled May 25, 2011 execution in Arizona of Donald Beaty, the United

19   States Attorney's Office notified the Arizona Attorney General that DEA had

20   "discovered" that Arizona's supply of thiopental was imported in violation of the

21   Controlled Substances Act and, therefore, could not be used.  *See id.* at ¶40 & Exh. 9.

22   Arizona immediately advised the State Supreme Court of the U.S. Attorney's notification

23   and the State's agreement not to use the drug.  *See id.* at ¶41 & Exh. 10.  The U.S.

24   Attorney's action turned on DEA's concern that the state had failed to fill out an import

25   declaration.  *See id*. at ¶41 & Exh. 11 at 2.  Arizona also reported that the U.S. Attorney's

26   "offered no explanation for the timing of the call regarding ADC's acquisition of sodium

27

28

CASE NO. C 11-01997 RS

**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

thiopental." *Id.* Mr. Beaty filed a motion to stay the execution, and the Court, also on May 24, 2011, temporarily stayed the May 25, 2011 execution. *See id.* at ¶44 & Exh. 14.[4]

Prior to the release of the Form 236s to Plaintiffs, DEA had no intention of seizing Arizona's drugs. Documents produced by DEA show that on April 4, 2011, DEA received a press inquiry about whether it was investigating Arizona's acquisition of the drug, given its seizure of drug supplies from other states. *See* Minsker Decl., Exh. 13 at Bates 38-39. DEA's Public Affairs Officer asked of various officials: "DOJ wants to know ASAP if DEA Phoenix plans to seize AZ DOC's supply of thiopental before a scheduled execution." An official responded: "No. We have not received information that would cause us to seize the drugs from the prison system." *Id.* While DEA's intention not to seize Arizona's drugs was clear, the reason given was odd. DEA was always in a position to verify whether Arizona had filed *with DEA* an import declaration and thus complied with the Controlled Substances Act. *See id.* at ¶43.

National press covered DEA's enforcement of federal drug law against Arizona on the eve of the Beaty execution and raised questions about why DEA took so long to do so. *See, e.g.,* Ariande de Vogue, "DOJ Tells Arizona it Illegally Obtained Death Penalty Drug," *ABC News,* May 25, 2011; Associated Press, "High Court stops Scheduled Execution for Arizona Inmate," May 25, 2011; David Schwartz, "Arizona Supreme Court stays execution," Reuters, May 25, 2011 (all attached as Minsker Decl., Exh. 12).

It was also reported in June 2011 that DEA contacted Nebraska prison officials, who voluntarily agreed to destroy the state's supply of the drug. *See* Minsker Decl. at ¶45.

Further, DEA's declaration in this matter reveals that DEA took enforcement actions related to the importation of the drug in two field divisions on unspecified dates after April 27, 2011, the same day that Plaintiffs informed DEA they would seek a preliminary injunction in this matter. *See* Myrick Decl. (52-1) at ¶¶12, 16.

/ / /

---

[4] The Court ultimately allowed the execution to proceed with a substitute drug. *See id.* at ¶44 & Exh. 15.

**J.      DEA Produces More Documents After Losing Key Issues on Summary Judgment**

After DEA produced the four import declarations on May 23, 2011, it provided less redacted versions of documents it had already provided, but engaged in no further searches and produced no new documents.  *See* Minsker Decl. at ¶47.  DEA refused to make any further search efforts despite continued efforts by Plaintiffs to point to specific additional searches that should be conducted.  *See* Lye Decl. at ¶¶17-18 & Exh. 1.

Prior to summary judgment, DEA had processed 281 pages, producing in part of full 104 pages and withholding 177.  The parties met and conferred; Plaintiffs agreed to challenge a subset of DEA's withholdings.  *See* Minsker Decl. at ¶48.

The parties' cross-moved for summary judgment, with DEA contending its search was reasonable and it had properly withheld exempt information.  *See* Doc. 35.

Plaintiffs again contended that DEA had failed to perform an adequate search, reiterating many of the arguments it had previously made at the preliminary injunction stage about which offices DEA should have, but failed to search (the DEA Administrator's Office, various additional Field Divisions), *compare* Doc. 41 at 15-16 of 31, *with* Doc. 25 at 3-4 of 11, and why the search it had conducted of DEA Headquarters was inadequate (noting, among other things, that certain documents known to exist were not produced by DEA), *compare* Doc. 41 at 17-20 of 31, *with* Doc. 25 at 5-7 of 11.

With respect to exemptions, Plaintiffs challenged the adequacy of DEA's *Vaughn* index as conclusory.  *See* Doc. 41 at 21 of 31.  They further objected to various exemptions invoked by DEA.  *See id.* at 21-31 of 31.

The Court's summary judgment order granted in large part Plaintiffs' motion.

***Inadequacy of search***.  The Court agreed with Plaintiffs that DEA failed to search certain offices, in particular the DEA Administrator's Office and certain Field Divisions.  *See* Doc. 48 at 7-12 of 25; *see also id.* at 9 of 25 ("The agency's position mischaracterizes the evidence and the standard of review.").  It described DEA's position on the search it had conducted at Headquarters as "plainly insufficient."  *See* Doc. 48 at 13 of 25.

11

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

Pursuant to Court order, DEA engaged in further searches of the DEA Administrator's Office, various Field Divisions, and the Regulatory Section at DEA Headquarters, and as a result produced 77 additional records to Plaintiffs. *See* Myrick Decl. (Doc. 52-1) at ¶¶6, 16, 32, 34.

*Exemptions*. The only exemptions as to which DEA prevailed was its invocation of §552(b)(5) for email communications between the Phoenix Field Division and the Office of Diversion and (b)(7)(A), also for certain email communications. *See* Doc. 48 at 24 of 25. On all other exemptions, the Court granted summary judgment for Plaintiffs:

- It rejected DEA's reliance on §552(b)(4) to withhold the quantity and identity of a sodium thiopental supplier given DEA's "fatal" failure to provide any evidence showing competitive harm. *See* Doc. 48 at 17 of 25. DEA provided the required disclosure. *See* Myrick Decl. (Doc. 52-1) at ¶33.

- The Court found DEA's description in its *Vaughn* index of a "briefing paper" for the DEA Administrator "merely conclusory" and required it to supplement the description and disclose any reasonably segregable factual passages. *See* Doc. 48 at 19 of 25. DEA disclosed the briefing paper in full. *See* Myrick Decl. (Doc. 52-1) at ¶33.

- The Court required disclosure of political appointees and senior officials whose identities had been withheld, because DEA made "no showing" under either (b)(7)(C) or (b)(6) that disclosure would lead to an unwarranted invasion of personal privacy. *See* Doc. 48 at 21 of 25. DEA provided the required disclosure. *See* Myrick Decl. (Doc. 52-1) at ¶33.[5]

- With respect to large categories of "miscellaneous" documents that DEA withheld pursuant to (b)(7)(A), the Court required the agency to revise its *Vaughn* index and actually explain how release of the documents would interfere with its law enforcement mission. *See* Doc. 48 at 24 of 25. DEA has revised its *Vaughn* index. *See* Myrick Decl. (Doc. 52-1), Exh. D.

**K.   Significance of Documents Disclosed Pursuant to Court Order**

Pursuant to the Court's order, DEA produced information in November 2011 it had previously withheld, and also conducted further searches, resulting in the production of 77 additional pages in December 2011. *See* Myrick Decl. (Doc. 52-1) at ¶¶33-34.

---

[5] DEA's declaration states that "the identities of a few senior and public affairs officials had been "inadvertently withheld." *Id.* at ¶33. The record belies DEA's claim of inadvertent withholding. Defendant knew at the summary judgment stage that Plaintiffs objected to the "redactions of elected officials, political appointees, or other high-level decision-makers," but continued to assert that withholding that information "was proper." *See* Doc. 43 at 15:8-9 and 16:14 of 18.

12

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1    The new documents revealed further information showing that DEA publicly

2    stated its commitment to enforcing federal drug laws, but failed to take prompt action to

3    seize sodium thiopental from states that had imported the drug unlawfully.  *See* Minsker

4    Decl. at ¶52.  For example, a briefing paper prepared for DEA Administrator Leonhart

5    shows that DEA knew as early as November 2010 that only two import declarations had

6    been filed for California and Texas imports, but took months to take any action as to the

7    numerous other states that had imported the drug, including waiting until the day before

8    the Arizona execution of Donald Beaty in late May 2011.  *Id.* at ¶55 & Exh. 16 at Bates

9    49-50.  Another document showed that DEA on a March 16, 2011 teleconference firmly

10   declared to two other federal agencies that it was "prepared to take enforcement action,

11   such as the Georgia investigation, when sodium thiopental is imported without adequate

12   DEA declaration," but then delayed taking any enforcement action, even when states like

13   Arizona and Nebraska, that had imported the drug without filing import declarations, set

14   execution dates.  *See id.* at ¶58-59 & Exh. 17 at Bates 8-9.

15   Other documents show that critical components within DEA were apparently out

16   of the loop:  When contacted by the Department of Justice in December 2010, the Chief

17   Counsel's office was unaware that "somebody in DEA has already been consulted about

18   this issue."  *Id.* at ¶57 & Exh. 17 at Bates 28.

19   **L.    The Lawsuit is Dismissed and the Parties Meet and Confer on Fees**

20   Plaintiffs agreed not to challenge any further withholdings by DEA.  *See* Doc. 54

21   ¶5 & Doc 55.  The parties then stipulated to a dismissal of the action on April 26, 2012

22   and on that same date, this Court entered the order of dismissal.  *See* Docs. 55 & 56.

23   The parties also met and conferred with regard to Plaintiffs' claim for reasonable

24   attorneys' fees.  Despite the parties' efforts, no settlement could be reached.  *See* Doc. 55

25   & Lye Decl. at ¶23.  This motion follows.

26

27

28

13

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

# III. ARGUMENT

## A.   PLAINTIFFS ARE ELIGIBLE AND ENTITLED TO AN AWARD OF REASONABLE ATTORNEYS' FEES AND LITIGATION COSTS

The FOIA provides for an award of reasonable attorneys' fees to plaintiffs who have "substantially prevailed" in their FOIA actions. The applicable statutory language is set out in 5 U.S.C. §552(a)(4)(E):

> (E) (i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.
> (ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—
> (I) a judicial order, or an enforceable written agreement or consent decree; or
> (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

Plaintiffs must demonstrate both eligibility for and entitlement to the award. *Long v. IRS,* 932 F.2d 1309, 1313 (9th Cir. 1991). Plaintiffs here readily meet both prongs.

### 1.   Having Substantially Prevailed, Plaintiffs Are Eligible for a Fee Award

Having substantially prevailed in this action, Plaintiffs are eligible for an award of reasonable attorneys' fees and costs under both subsections of §552(a)(4)(E)(ii).

First, when, in response to Plaintiffs' preliminary injunction motion, DEA produced documents on May 4, 2011 and May 16, 2012, Plaintiffs substantially prevailed under Subsection (II). Added in 2007, this provision "authorizes the payment of attorney fees when documents … are recovered using a catalyst theory." *Oregon Natural Desert Assn. v. Locke*, 572 F.3d 610, 612 (9th Cir. 2009); *see also id.* at 614-15 (discussing legislative history). According to the legislative history: "Under the bill, a FOIA requester can obtain attorneys' fees when he or she files a lawsuit to obtain records from the Government and the Government releases those records before the court orders them to do so." 153 Cong. Rec. S15701-04 (daily ed. Dec. 14, 2007) (statement of Sen. Leahy, sponsor of the 2007 Amendments).

DEA produced records on May 4 and May 16, 2011, before this Court had ordered

14

1    it to produce any records.  DEA admits that its key records search was "prompted" by and

2    conducted "[i]n response to" Plaintiffs' lawsuit.  Myrick Decl. (Doc. 25-2) at ¶5.  Further,

3    DEA failed to send out requests for consultation to other agencies (a prerequisite to

4    producing documents), produce a first set of documents, or commit to completing its

5    production by a date certain until after Plaintiffs filed the preliminary injunction motion.

6    The May 4 and May 16 productions plainly represented a voluntary or unilateral change in

7    DEA's position, precipitated by Plaintiffs' "not insubstantial" lawsuit, as DEA's own

8    declaration candidly admitted.  *See supra* at II-G.

9         Second, Plaintiffs also substantially prevailed when DEA produced the Form 236s

10   on May 23, 2011.  These documents, too, were not produced pursuant to court order; this

11   Court had denied the preliminary injunction motion that same day.  But Plaintiffs'

12   persistence in demanding the Form 236s in their reply brief, the Joint Statement following

13   the preliminary injunction hearing, and in their separate May 20, 2011 letter to DEA,

14   served as a catalyst for DEA's production of these critical documents.  *See supra* at II-H.

15        Plaintiffs' requests and the documents they obtained on May 4, 16, and 23, 2011

16   were "not insubstantial."  They exposed the fact that numerous states, in their rush to

17   secure execution drugs, had illegally acquired foreign drugs that lacked any assurance of

18   safety or efficacy.  All along, DEA had in its possession the relevant information of

19   Arizona's illegal conduct, but did not intend to do anything about it.  *See* Minsker Decl. at

20   ¶43 & Exh. 11 at Bates 38-39.  It was only after Plaintiffs obtained the Form 236s that

21   DEA finally notified Arizona that it could not use the drug in an execution.  The issue

22   received extensive, nationwide media coverage.  *See supra* at II-I.

23        Third, Plaintiffs also substantially prevailed under Subsection (I) by obtaining

24   judicial relief.  When DEA conducted additional searches and produced documents in

25   November and December 2011, pursuant to the Court's summary judgment order (*see*

26   *supra* at II-K; Myrick Decl. (Doc. 52-1) at ¶¶33-34), this requirement was met.

27        **2.     Plaintiffs Are Entitled to a Fee Award**

28        Plaintiffs also readily meet FOIA's "entitlement" prong. To determine whether a

15

1  plaintiff is entitled to an award of attorney's fees and costs under FOIA, the court must

2  consider four factors: "(1) the benefit to the public, if any, derived from the case; (2) the

3  commercial benefit to the complainant; (3) the nature of the complainant's interest in the

4  records sought; and (4) whether the government's withholding of the records had a

5  reasonable basis in law." *Cuneo v. Rumsfeld,* 553 F.2d 1360, 1364 (D.C. Cir. 1977).  The

6  second and third factors "are closely related" and often evaluated together.  *Fenster v.*

7  *Brown,* 617 F.2d 740, 743 (D.C. Cir. 1979).

8       The analysis as to the first three factors is identical for work on the May 2011

9  productions and the November-December 2011 post-summary judgment productions.

10      The first public benefit factor weighs overwhelmingly in Plaintiffs' favor.

11  Information that courts have found to confer a public benefit include disclosures that

12  "br[ought] into question the practices and policies of the U.S. [Customs Service] with

13  respect to the seizure of counterfeit goods," *Playboy Enter. v. U.S. Customs Serv.,* 959

14  F.Supp.11, 16 (D.D.C. 1997), that disclosed information relating to the government's

15  Terrorist Surveillance Program, *Judicial Watch, Inc. v. U.S. Dept. of Justice*, 774

16  F.Supp.2d 225, 227 (D.D.C. 2011), and that disclosed information pertaining to whole

17  body imaging technology used in scanners at airports, *Elec. Priv. Info. Ctr. v. U.S. Dept.*

18  *of Homeland Sec.*, 811 F.Supp.2d 216, 234 (D.D.C. 2011) (*EPIC*).

19      Foreign drugs lack the same assurance of safety and efficacy as domestic drugs

20  and thus potentially expose an inmate to excruciating, unconstitutional pain.  *See Rx.*

21  *Depot,* 290 F.Supp.2d at 1241-42; *Tilton,* 465 F.Supp.2d at 975.  The documents obtained

22  here exposed the fact that numerous states illegally procured foreign drugs in their haste to

23  carry out executions, and that DEA gave lip service to enforcing federal drugs laws, while

24  sitting on knowledge that only a few states of the ten that imported the drug had done so

25  lawfully, and almost allowing a man in Arizona to be executed with an illegal foreign

26  drug.  *See supra* at II-I&K.

27      The records here also "were covered extensively in the news," *id*., and called into

28  question DEA's lax "practices and policies…with respect to the seizure of" execution

drugs. *Playboy*, 959 F.Supp. at 16.  That information undoubtedly "'furthered public understanding'" on a topic as weighty as the death penalty and is "'likely to add to the fund of information that citizens may use in making vital political choices.'"  *EPIC,* 811 F.Supp.2d at 234 (internal citations omitted); *see also California First Amendment Coalition,* 299 F.3d at 876 ("An informed public debate is critical in determining whether execution by lethal injection comports with the evolving standards of decency which mark the progress of a maturing society.") (internal citations omitted); *Tilton*, 465 F.Supp.2d at 973 ("Few issues in American society have generated as much impassioned debate as the death penalty.").

The second and third factors also strongly favor Plaintiffs. The ACLU-NC is a non-profit organization with no commercial interest in the documents requested.  *See* Lye Decl. at ¶24; *see also EPIC,* 811 F.Supp.2d at 235 ("Fee recovery is often appropriate …when the plaintiff is a nonprofit public interest group.")  Likewise, the San Francisco Bay Guardian's interest is purely journalistic, which again strongly favors a fee award.  *Id.* ("'FOIA suits which are motivated by scholarly, journalistic, or public interest concerns are the proper recipients of fee awards.[citation omitted]'").

As to the fourth factor, DEA will likely claim to have had a reasonable basis in law for withholding documents.  On this issue, however, *DEA* bears the burden of "show[ing] that it had any colorable or reasonable basis for not disclosing the material until after [Plaintiffs] filed suit."  *Davy v. CIA,* 550 F.3d 1155, 1163 (D.C. Cir. 2008).

As to documents produced in May 2011, although DEA "voluntarily" produced them, it had no basis, let alone a reasonable one, for withholding them prior to that time. "[I]t is insufficient for an agency simply to claim that i[t] 'offered no resistance' and quickly responded to a FOIA request upon being subjected to suit." *EPIC,* 811 F.Supp.2d at 235 (quoting *Davy,* 550 F.3d at 1163).

As to documents produced in November and December 2011, DEA also lacked a reasonable basis.  The December 2011 production consists of documents produced as a result of searches that DEA had refused to undertake, despite Plaintiffs repeated efforts to

explain to DEA why its search was inadequate.  *See* Minsker Decl. at ¶¶27, 33-34; Lye Decl. at ¶¶15, 17-18 & Exh. 1.  In ordering DEA to engage in further searches on summary judgment, the Court necessarily concluded that DEA had *failed* to conduct a "search reasonably calculated to uncover all relevant documents."  *Citizens Comm'n on Human Rights v. FDA,* 45 F.3d 1325, 1328 (9th Cir. 1995).

The November 2011 production consists of documents the Court on summary judgment ordered DEA to disclose .  The Court's ruling highlights the unreasonableness of DEA's withholdings.  DEA invoked §552(b)(4) to withhold information pertaining to a sodium thiopental supplier despite the absence of *any* evidence to substantiate its claim of competitive harm.  *See* Doc. 48 at 17 of 25.  DEA relied on a "merely conclusory" declaration to justify withholding a briefing paper for the DEA Administrator.  *See id*. at 19 of 25.  And it made "no showing" to justify claims of privacy invasion, in withholding names of political appointees and senior officials.  *See id.* at 21 of 25.

The failure of the DEA's rationale for withholding documents and conducting too limited a search to withstand summary judgment is strong evidence that it had no colorable or reasonable basis for doing so.  *See EPIC,* 811 F.Supp.2d at 236 fn. 12.

The public benefit served by Plaintiffs' lawsuit is dispositive here.  FOIA's legislative history makes clear that "[e]ach criterion should be considered independently, so that, for example, newsmen would ordinarily recover fees even where the government's defense had a reasonable basis in law, while corporate interests might recover where the withholding was without such basis." S. REP. NO. 93–854, at 171–72 (1974) (quoted in *Deininger & Wingfield, P.A. v. I.R.S.,* 2009 WL 2241569 *6 (E.D. Ark. 2009).  The critical facts here are that Plaintiffs, a public interest civil rights organization and a newspaper seeking to shed light on the federal government's reluctant enforcement of the nation's drug laws in the context of capital punishment, stand to obtain no commercial benefit from the disclosures and by exposing these practices, easily satisfy the "public benefit" criterion for fee entitlement.  Thus, even if DEA could satisfy its burden of showing a reasonable basis for withholding any of the documents produced – which it cannot – Plaintiffs are still entitled to fees based on the public benefit criterion.

1    **B.      PLAINTIFFS' ATTORNEYS' FEES ARE REASONABLE**

2          **1.      A Summary of Plaintiffs' Claim.**

3          Under FOIA, the determination of whether Plaintiffs' attorneys' fees are

4    reasonable begins with a determination of the lodestar – reasonable hourly rates multiplied

5    by the number of hours reasonably spent.  *See*, *e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424,

6    433 (1983).  Under federal law, there is "a strong presumption that the lodestar represents

7    a reasonable fee." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1993).  In "rare

8    cases," the lodestar may be adjusted upward or downward on the basis of any of the

9    twelve factors in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir. 1975), not

10   subsumed in the lodestar calculation.  *Id.* at 1402.

11         In the instant case, Plaintiffs' fee request is quite modest.  The total lodestar

12   requested for work on the merits is $119,573, based on 161.3 hours requested for Ms.

13   Lye's work at a 2011 rate of $575 per hour, 37.9 hours requested for Mr. Risher's work at

14   his 2011 rate of $595 per hour, and 28.5 hours requested for work performed by the

15   ACLU's Law Clerk, at $150 per hour.[6]  *See* Lye Decl. at ¶¶26-29.

16         Plaintiffs' litigation costs, totaling $386.61, include the court filing fee, service of

17   process fees, and chambers' copy delivery fees, and are fully recoverable.  *See* Lye Decl.

18   at ¶35 & Exh. 3; *see also* 5 U.S.C. §552(a)(4)(E)(i) (court "may assess … other litigation

19   costs reasonably incurred"); *Kuzma v. IRS,* 821 F.2d 930, 932 (2d Cir. 1987).

20         Plaintiffs also are entitled to their fees for this motion.  *See, e.g., Davis v. City &*

21   *County of San Francisco,* 976 F.2d 1536, 1544 (9th Cir. 1992); *Read v. FAA,* 252

22   F.Supp.2d 1108, 1113 (W.D. Wash. 2003).  The total lodestar for fee-related services (to

23   date) is $ 31,485 – 35.4 hours spent by Ms. Lye, at $575 per hour; 15.9 hours spent by Mr.

24   Pearl, at $700 per hour – to be supplemented for additional work on reply.  Lye Decl. at

25   _____

26   [6]  Although statutory fees are normally based on current rates, fees against the federal
     government must be based on "historical" rates. *See, e.g., Save Our Cumberland Mtns.,*
27   *Inc. v. Hodel,* 857 F.2d 1516, 1525 (D.C. Cir. 1988).  Accordingly, Plaintiffs ACLU
     attorneys have requested 2011 rates for their work performed in 2011.  In the exercise of
28   billing judgment, they have not increased their rates for work performed in 2012, even
     though rates generally have risen.  *See* Pearl Decl. at ¶10-14 and Exhs. 3-6.

¶¶36-37 & Exh. 4; Pearl Decl. at ¶7 and Exh. 2.  That figure also is eminently reasonable.

## 2.  Plaintiffs' Lodestar Is Reasonable

### a.  Counsel's Hourly Rates Are Reasonable.

Under federal fee-shifting law, Plaintiffs' counsel are entitled to the hourly rates they have requested if those rates are "in line with" the rates charged by attorneys of reasonably comparable experience, expertise, and skill for reasonably comparable work. *See Blum v. Stenson,* 465 U.S. 886, 895 fn. 11 (1984).  The fair market value of the work performed sets the measure, as determined by the rates charged by commercial firms for reasonably similar federal litigation.  *Davis,* 976 F.2d at 1547, *affirming U.S. v. City & County of San Francisco*, 748 F.Supp. 1416, 1431 (N.D.Cal. 1990) (plaintiff's non-profit attorneys entitled to rates charged by "corporate attorneys of equal caliber").[7]

Plaintiffs' counsel's rates here are well "in line with" the rates charged by San Francisco attorneys of reasonably comparable experience and qualifications for reasonably comparable work.

Ms. Lye's $575 per hour rate reflects her more than 12 years of experience since graduating from Boalt Hall in 1999, including service as a law clerk to Second Circuit Judge Guido Calabresi and Justice Ruth Bader Ginsburg of the United States Supreme Court.  After clerking, she joined Altshuler Berzon LLP, where she was an associate and then partner representing clients on labor, environmental, and constitutional issues in federal and state court, as well as administrative and arbitral fora.  In 2010, she joined the American Civil Liberties Union Foundation of Northern California, where her practice has emphasized free speech, open government, and privacy.  *See* Lye Decl. at ¶24.  Given her

---

[7]  The DEA has indicated that Plaintiffs' counsel should be compensated pursuant to the "Laffey Matrix," as adjusted for Bay Area costs.  The Laffey Matrix is a schedule of hourly rates devised by the District of Columbia courts based on rates charged in the District.  *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010).  However, the Ninth Circuit has expressly rejected the applicability of the Laffey matrix to Northern District cases, even when adjusted to account for higher San Francisco costs.  *See id.* ("But just because the *Laffey* matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away. It is questionable whether the matrix is a reliable measure of rates even in Alexandria, Virginia, just across the river from the nation's capital.").

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1   impeccable credentials and experience, and the quality of the work performed, the 2011

2   rate requested for Ms. Lye's work is perfectly reasonable.  *See Blum,* 465 U.S. at 890 fn. 4

3   (noting counsel's clerking experience).  As Michael Rubin, a senior partner at San

4   Francisco's Altshuler Berzon LLP attests, Ms. Lye's rate is consistent with the San

5   Francisco market generally and precisely the rate his firm would charge commercial

6   clients for her work had she remained there.  Rubin Decl. at ¶8; *see also* Pearl Decl. at

7   ¶¶8-14 & Exhs. 3-5 (surveying San Francisco market and recent fee awards).

8          Likewise, Mr. Risher's $595 per hour rate reflects his 15 years of experience as a

9   civil litigator and criminal defense attorney.  After graduating from Stanford Law School

10  with distinction and as a member of the Order of the Coif in 1996, he clerked for Sixth

11  Circuit Judge Karen Moore.  At the ACLU, Mr. Risher's practice has focused on civil

12  rights litigation, especially criminal justice, privacy, and open government issues.  He has

13  obtained significant successes on novel legal issues, and tried more than twenty cases to

14  verdict.   Lye Decl. at ¶25.  His rate also is well in line with the San Francisco market.

15  Rubin Decl. at ¶7; Pearl Decl. at ¶¶8-14 & Exhs. 3-6.

16         Mr. Pearl's rate also is reasonable.  He is a 43rd-year attorney with extensive

17  experience litigating attorney fee matters in federal and state trial and appellate courts.

18  Pearl Decl. at ¶¶2-5 and Exh. A.  He is the author of state and federal manuals on attorney

19  fee awards, including *California Attorney Fee Awards*, 3d Ed., published by California's

20  Continuing Education of the Bar in 2010 and updated annually since.  *Id.*  Numerous

21  courts have determined his rates to be reasonable. *Id.* at ¶6; *see also* Rubin Decl. at ¶10.

22         Finally, the hourly rate requested for ACLU's Law Clerk ($150) is modest by Bay

23  Area standards.  *See* Rubin Decl. at ¶ 9 (Altshuler Berzon bills law clerks at $225 per

24  hour); Pearl Decl. at ¶9.

25             **b.        The Number of Hours Claimed Is Reasonable**

26         Under federal law, successful Plaintiffs' counsel are entitled to be compensated for

27  every hour reasonably spent to vindicate their clients' interests:  "Where a plaintiff has

28  obtained excellent results, his attorney should recover a *fully compensatory fee*. Normally,

21

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

this will encompass *all hours reasonably expended on the litigation*, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley v. Eckerhart*, 461 U.S. at 435 (emphasis added).  Having achieved excellent results here, Plaintiffs' counsel are entitled to just such a fully compensatory fee.

Time is reasonably spent and thus compensable if the work is reasonably directed to achieving the client's goals, even if it does not produce a favorable result.  *See Balla v. State of Idaho*, __F.3d __, 2012 WL 1293410 at *9 (9th Cir. 2012) (fees "directly and reasonably incurred" where attorneys "work was what one would expect of a lawyer working for a client that could afford its efforts but that was not indifferent to the cost"); *Coordinated Pretrial Proceeding v. Exxon Corp.*, 109 F.3d 602, 608 (9th Cir. 1997) ("Good legal representation regularly includes some work which does not bear fruit").

Once the plaintiff has presented a fully-documented claim, "[t]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits."  *Gates*, 987 F.2d at 1397-98.  Defendant's burden is to show that "the time claimed is obviously and convincingly excessive under the circumstances."  *Perkins v. Mobile Housing Board*, 847 F.2d 735, 738 (11th Cir. 1988).

> **(1)   Plaintiffs' hours are fully-documented and modest for a case of this novelty and importance**

The hours for which compensation is requested are modest and eminently reasonable for a case of this importance. Several factors support Plaintiffs' request:

- Plaintiffs' claim is fully documented by detailed, contemporaneous time records showing when and how each tenth of an hour was spent. Lye Decl. ¶31 and Exh. 2; Pearl Decl. ¶7 and Exh. B.  *See Perkins*, 847 F.2d at 738 (counsel's "sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case").

- Plaintiffs have exercised billing judgment, writing off all time that was marginally non-compensable and eliminating hours to avoid duplication. Lye Decl. ¶32, 38.

- Plaintiffs' counsel staffed this case efficiently and leanly. Only two attorneys worked on the case for Plaintiffs, even though cases involving preliminary injunctions often involve a whole team of attorneys. Lye Decl. ¶33. Those attorneys carefully divided work between them, avoiding any unnecessary

22

1  duplication and utilizing a law clerk when it was feasible.  Lye Decl. ¶34.  Only
2  time that is "unnecessarily" duplicative is non-compensable. *See Moreno v. City of
   *Sacramento*, 534 F.3d 1106, 1113 (9th Cir. 2008) ("It is only where the lawyer
   does *unnecessarily* duplicative work that the court may legitimately cut the
3  hours.") (emphasis in original).  No such "duplication" occurred here.

4  • This case was very hard-fought.  DEA, for example, heavily resisted producing the
   DEA Form 236s.  But Plaintiffs repeatedly raised their absence, in their reply, in
5  the Joint Statement after the preliminary injunction hearing, and in a separate letter
   to DEA.  *See* Doc. 21, Doc. 25 & Minsker Decl. at ¶¶26, 32-33, 36 & Exh. 6.
6  Plaintiffs' persistence paid off when DEA produced the documents on May 23,
   2011.  *See supra* at II-H.  Thus, while Plaintiffs' counsel were thorough, any lesser
7  effort might well have jeopardized the Plaintiffs' rights.  *Guam Soc. of
   Obstetricians and Gynecologists v. Ada,* 100 F.3d 691, 700 (9th Cir. 1996).

8          **(2)    Plaintiffs are entitled to a fully compensatory fee**

9          Finally, the success Plaintiffs achieved fully justifies a fully compensatory fee.

10  Plaintiffs won this case, obtaining key documents in response to their preliminary

11  injunction motion and prevailing on the majority of their claims on summary judgment.

12  *See supra* at III-A-1.  "[A] plaintiff does not need to receive all the relief requested in

13  order to show excellent results warranting the fully compensatory fee." *Dang v. Cross,*

14  422 F.3d 800, 813 (9th Cir. 2005) (citing *Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir.

15  2001)).  Indeed, *Hensley* expressly recognizes that Plaintiffs need not achieve every form

16  of relief sought to recover a fully compensatory fee.  461 U.S. at 435 n. 11.

17          Here, all of Plaintiffs' claims were "related," obviating the need for any reduction

18  due to "unsuccessful claims."  *See, e.g., Dang,* 422 F.3d at 813 ("'[C]laims are *unrelated*

19  if the successful and unsuccessful claims are "distinctly different" *both* legally *and*

20  factually'; claims are related, however, if they 'involve a common core of facts *or* are

21  based on related legal theories.'") (internal citations omitted; emphasis in original).

22  Plaintiffs' document requests all involved the same legal theories and a common course of

23  conduct by the DEA: all the documents concerned DEA's efforts (or lack thereof) to

24  enforce our nation's drug laws as to states importing drugs to execute inmates; all the legal

25  theories involved the issue of whether particular documents were exempt and/or whether

26  the DEA had conducted an adequate search; and all the claims in this case arose out of a

27  common core of facts – DEA's unlawful withholding of documents concerning its

28  enforcement of drug import requirements.  Further, Plaintiffs claims at the preliminary

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

injunction and summary judgment stages were not only "related," many were identical. Work on the preliminary injunction motion largely involved developing arguments about the inadequacy of DEA's search, arguments that reiterated on summary judgment and on which Plaintiffs prevailed.  *See* Lye Decl. at ¶¶14-21.

That Plaintiffs lost the preliminary injunction motion is not dispositive. All of the hours associated with that motion had a substantial causative effect on DEA's production of documents on May 4, May 6, and May 23, 2011, *see supra* at II-G&H, thereby advancing Plaintiffs goal of obtaining documents in advance of the Arizona execution.  In *Assembly of the State of California v. Dept. of Commerce*, 1993 WL 188328 (E.D.Cal. 1993), for example, the court awarded fees in a FOIA case where, *inter alia*, the defendant only agreed to an expedited schedule when faced with an application for order shortening time on a preliminary injunction motion: "in a practical sense the motion served to advance plaintiffs' goal of quick resolution."  *Id.* at *8.  Likewise, in *Balla*, the Ninth Circuit held that where the plaintiff's contempt motion caused the defendant to comply with the court's judgment, fees were properly awarded even though the contempt motion was denied. _F.3d._, 2012 WL 1293410 at *8-9.  Analogizing to a party pursuing a discovery motion, the Ninth Circuit recognized that such a party has "prevailed" on that motion if it triggers a voluntary response from the opposing party, even if the motion is then " lost": "The victory sought is getting the answers or documents, not getting an order to produce them."  *Id.* at *9.  This is precisely what happened here.  "Thus there is nothing unusual about awarding fees for losing, when the loss is caused by the effectiveness of the legal work in bringing about performance of a legal obligation." *Id.*

Furthermore, Plaintiffs' counsel reasonably and prudently pursued the preliminary injunction motion, given the high stakes – the potential for executing inmates with illegal foreign drugs lacking an assurance of safety and efficacy – and DEA's refusal to commit prior to the filing of the motion to produce documents by a date certain and the inadequacy of the initial document production, particularly, the absence of any Form 236s. *See* Lye Decl. at ¶¶13-15; Minsker Decl. at ¶¶24-27, 31-36.  The same is true of the relief

24

1  sought on summary judgment.  While not every element of relief was obtained, the relief

2  sought was reasonable and fully justified by the relief obtained.  *See Balla,* _F.3d _, 2012

3  WL 1293410 at *9 ("a judge properly looks at whether what the lawyer did was

4  reasonable when he did it"); *Moreno,* 534 F.3d at 1112 ("By and large, the court should

5  defer to the winning lawyer's professional judgment as to how much time he was required

6  to spend on the case; after all, he won, and might not have, had he been more of a

7  slacker."); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (plaintiffs

8  entitled to compensation for "every item of service which, at the time rendered, would

9  have been undertaken by a reasonable and prudent lawyer to advance or protect his client's

10  interest ....").

11    Moreover, the issue raised by Plaintiffs' lawsuit here is critically important in the

12  ongoing national debate over capital punishment and the means chosen to execute it.  The

13  ultimate issue has been whether DEA turned a blind eye to states' unlawful importation of

14  foreign drugs – drugs which lack an assurance of safety or efficacy – to execute inmates.

15  As a result of this lawsuit, Plaintiffs obtained documents exposing illegal state practices

16  and lax enforcement by DEA, leading to widespread media coverage and DEA's eleventh

17  hour decision to act on information it long had in its possession and to prevent Arizona

18  from executing an inmate with an illegal foreign drug.  *See supra* at II-I & K; Minsker

19  Decl. at ¶¶38-44, 54-59. Plaintiffs also obtained a significant vindication of their rights in

20  this Court's Summary Judgment Order – a valuable benefit in itself.  *See supra* at II-J.  By

21  any standard, these are excellent results warranting a fully compensatory fee.

22            **IV.    CONCLUSION**

23    Plaintiffs' attorneys have performed precisely the service that Congress intended to

24  promote when it enacted FOIA's attorneys' fee provision.  For the foregoing reasons,

25  Plaintiffs respectfully request that they be awarded their reasonable attorneys' fees and

26  litigation costs as set forth herein, as well as those fees and costs incurred subsequently on

27  this motion.

28

CASE NO. C 11-01997 RS
**Plaintiffs' Notice Of Motion And Motion For Reasonable Attorneys' Fees And Litigation Costs; MPA In Support**

1

2    Dated: May 10, 2012                   Respectfully submitted,

3                                          By: _____/s/_____
                                                   Richard M. Pearl

4                                          Richard M. Pearl
                                           LAW OFFICES OF RICHARD M. PEARL
5

6                                          Michael T. Risher
                                           Linda Lye
7                                          AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF NORTHERN CALIFORNIA

8                                          Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28